UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | CRIM. NO. 04-30032-MAP |
| ) | |
| vs.    ) | |
| ) | UNDER SEAL |
| **FRANCIS G. KEOUGH, III** ) | |
| ) | |
| Defendant.    ) | |

## MOTION TO REVOKE CONDITIONS OF RELEASE AND UNSECURED BONDS

The United States of America respectfully moves this Court to revoke the order of release for defendant Francis G. Keough, III for violating his conditions of release pursuant to Title 18, United States Code, Sections 3148(b)(1)(A) and (b)(2)(A) and (B). Given the egregious nature of the defendant's violations, the Government further moves the court to issue an arrest warrant and have defendant Keough brought into custody immediately.

In addition, the Government moves the court to forfeit the unsecured bonds signed by defendant Keough and his wife, Sharon Keough. Having previously found defendant Keough in violation of his conditions of release, but not forfeited his initial $50,000.00 unsecured bond, the court must forfeit these bonds if they are to have any meaning or value as release conditions.

Dated this 3rd day of August, 2005.

                                  Respectfully submitted,

                                  MICHAEL P. SULLIVAN
                                  United States Attorney

By: _____
      WILLIAM M. WELCH II
      Assistant U.S. Attorney

**AFFIDAVIT OF CLIFFORD W. HEDGES**

I, Clifford W. Hedges, being duly sworn, state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) Boston Division, Springfield Resident Agency, located at 155 Brookdale Drive, Springfield, Massachusetts. I have been an FBI Special Agent since January 4, 1987. I, along with Special Agent Michael Brin of the Internal Revenue Service, and Special Agent Thomas Luke of Housing and Urban Development, have been participating in a grand jury investigation of Francis G. Keough, III and Friends of the Homeless, Inc. (hereinafter "FOH").

2. By way of background, part of the investigation has focused upon individuals on the FOH payroll who have been receiving paychecks for work not performed. These individuals primarily have been persons listed on the FOH payroll as intake employees. FOH has a number of individuals on the payroll who work as intake employees during the evening and night shifts. The evening shift is from 4:30 p.m. to 12:30 a.m. The night shift lasts from 12:30 a.m. until 8:30 a.m. The intake employees primarily sit in the front office inside FOH's main entrance and handle any problems that may arise during the evening hours. The intake employees receive their pay based upon an hourly rate and must fill out timesheets on a weekly basis. The intake employees receive a paycheck based upon the number of hours worked each week.

3. Keough knows that part of the investigation has related to possible "no-show" employees or employees receiving pay for work not performed. For example, on March 9, 2004, Keough appeared before the federal grand jury as FOH's custodian of records and produced all of FOH's employee timesheets pursuant to grand jury subpoena. During his appearance, Keough was questioned about the accuracy of the timesheets and his knowledge of timesheets reflecting hours actually worked by employees. See e.g. Exhibit A, Exhibit B.

4. On or about July 12, 2005, I interviewed Witness D under the terms of a proffer agreement. Witness D formerly worked as the intake supervisor of the evening shift at FOH. Witness D stated that he and Witness E normally worked two evening shifts per week, but that in early 2000, Keough told him and Witness E to submit timesheets reflecting that they worked an additional two shifts per week. Thereafter, from approximately January, 2000 through March, 2000, Witness D and Witness E received pay for four shifts per week when in fact they only actually worked two shifts per week. In fact, Witness D stated that he did not show up for work at all for approximately one

month during that time frame, yet still received a paycheck for four shifts per week. Witness D stated that Keough did this because he and Witness E were suffering financial problems at the time.

5. According to Witness D, Keough called him in the middle of June, 2005, and told Witness D to come over his house. When Witness D arrived, Keough told Witness D that "the feds" were investigating whether or not Witness D worked all of his shifts. Keough told Witness D that, if asked, Witness D should say that he worked all of his shifts at FOH.

6. On August 1, 2005, I served a grand jury subpoena on Witness E, the individual who Witness D had identified as being involved with him in the fraudulent timesheet scheme. I served the grand jury subpoena, which requires Witness E's personal appearance on August 4, 2005, upon Witness E based not only upon Witness D's information, but also because Witness E owned rental property at which inmates from the Hampden County House of Corrections had performed landscaping services. FOH had an agreement with the Hampden County House of Corrections that allowed inmates to perform maintenance at FOH on a daily basis. Keough had inmates perform maintenance at his personal properties and the personal property of other individuals rather than at FOH. Finally, I had information that Witness E, a city employee, had been at Keough's house for approximately two hours during the week of July 25, 2005 while on city time.

7. On August 1, 2005, I not only served the grand jury subpoena upon Witness E, but also confronted Witness E with the above information. Witness E acknowledged that Keough had put him in a jam, and that he was now subject to federal fraud charges. Witness E told me that he had read about the new charges against Keough and asked me if he could call Keough. I told Witness E that Witness E could do what Witness E wanted, but that the court had instructed Keough not to have contact with any witnesses, and that Witness E was a witness.

8. On August 2, 2005, I completed the proffer interview with Witness D. Witness D stated that at approximately 7:30 a.m. on August 2, 2005, Witness D received a telephone call from Sharon Keough, Frank Keough's wife. Sharon Keough told Witness D that Keough was depressed, and asked Witness D to stop by and see Keough. Witness D stated that he went to Keough's residence shortly thereafter and asked Keough how he was doing. Keough's son had to be at school by 8:00 a.m., and Keough was getting his son ready.

2

9. Keough told Witness D that Witness E had been at Keough's house last night. Keough reported to Witness D that Special Agent Hedges had served a grand jury subpoena on Witness E last night, and that Witness E looked pretty shaken. Keough also told Witness D that he had referred Witness E to Attorney Roy Anderson, who is Keough's cousin. Keough then asked Witness E if anyone had contacted Witness E, and Witness E told Keough that he had been contacted by Special Agent Hedges at FOH. Witness D stated that the entire visit lasted approximately five minutes, and that Witness D felt that the main purpose of the visit was to inform him that Witness E had been contacted by the FBI and served a grand jury subpoena.

10. I note that Witness D's information regarding Keough's obstructive conduct towards Witness D in June, 2005 had not been disclosed to Keough during the revocation hearing on July 29, 2005. Therefore, Keough had no knowledge that Witness D was cooperating on August 2, 2005. In addition, I note that during the proffer interview with Witness D on August 2, 2005, I never disclosed that I had served a grand jury subpoena on Witness E. Witness D stated that he has not talked to Witness E since approximately 2003. Therefore, that information had to have come from Keough on the morning of August 2nd as described by Witness D.

11. On the morning of August 3, 2005, I was contacted by Witness A. Witness A was the subject of Keough's obstructive conduct as charged in Counts Five, Six, and Seven in the Superseding Indictment. Witness A stated that on August 2, 2005, Sharon Keough called Witness A between 3:30 p.m. and 4:00 p.m. Sharon Keough told Witness A that Keough had asked her to call Witness A and ask Witness A to come over to the house and help him with the hot water heater. Witness A stated that he was reluctant to go over to Keough's house, but eventually went.

12. Upon arrival, Witness A looked at Keough's hot water heater and concluded that there was nothing wrong with it. Keough then told his wife to get Witness A something to drink and pulled out what looked a court document to Witness A. Keough told Witness A that his lawyer had given him this document. Keough asked Witness A if he was the Witness A referenced in the court document. Keough then began to show Witness A other references that Keough had highlighted in yellow and blue in the court document and asked Witness A who Witness A thought the

3

witnesses were. Finally, Keough told Witness A that Special Agent Hedges had visited Witness E.

                                              CLIFFORD W. HEDGES
                                              Special Agent, FBI

4

FRANCIS KEOUGH - 03/09/04                                32

1  he does work a few nights a week himself, but he's not there
2  seven nights a week.
3      Q   Okay.  Well, certainly the shift supervisor is
4  responsible for the people working on his shift at the time
5  that he or she is supervising them?
6      A   Yes.
7      Q   Okay.  Does that individual then sign off on the
8  time sheets?  Meaning the shift supervisor?
9      A   Yes.
10     Q   And ---
11     A   And that may not have always been the case.  When
12 I was looking at the time sheets, many years ago it wasn't,
13 but for the last few, you'll see initials on different
14 people -- next to people's time sheets, and those initials
15 are the shift supervisors.
16     Q   So the shift supervisor is the individual
17 responsible sort at the ground level, if you will, for
18 making sure that the hours listed on the time sheets are
19 true and accurate?
20     A   By and large, I would say that's accurate.
21     Q   Okay.  Well, is there any exception to that
22 statement?
23     A   Well, again, I'm not going to say with actual
24 certainty that the shift supervisor -- the shift
25 supervisor's primary responsibility is to make sure all

*APEX Reporting*
(617) 426-3077


GOVERNMENT EXHIBIT A

FRANCIS KEOUGH - 03/09/04                           33

1  shifts are covered, all time sheets are collected, that
2  people are there, and that if there's any incidents, like
3  with call outs or whatever else, the shift supervisor deals
4  with those issues.  And then I get them.
5         For example, I got a 1 o'clock in the morning a
6  couple of nights ago because there was an incident with one
7  of our guests, who was HIV positive and who was violent.
8  They called me.  But a lot of times the shift supervisor
9  would take those calls and say, okay, I'll do them.
10        But primarily it's just for scheduling, collecting
11 the time sheets, making sure that, you know, by and large
12 they're accurate.  For example, checking to make sure that
13 the hours listed on a time sheet are hours that people were
14 scheduled to work.
15     Q   Okay.  Well, let me ask you this then:  Do the
16 time sheets reflect the hours that people are scheduled to
17 work or are they supposed to reflect the hours that people
18 actually show up and work?
19     A   They should reflect the hours people actually show
20 up and work, and I'm assuming that they do.
21     Q   Okay.  So is it your understanding that, with
22 respect to the evening shift, the time sheets being handed
23 in are time sheets for individuals showing up and working
24 for the hours that appear on their time sheets?
25     A   Yes.

*APEX Reporting*
(617) 426-3077

FRANCIS KEOUGH - 03/09/04                                    34

1    Q    Do you have any reason to believe that that is not
2    the case?
3    A    No.
4    Q    Okay.  And ultimately, at least at the ground
5    level, is it the shift supervisor who is supposed to make
6    sure that the people show up for work and work the hours
7    that appear on their time sheets?
8    A    I would say in combination with myself, sure.
9    Q    Okay.  When you say in combination ---
10   A    Well, if somebody is leaving -- for example,
11   somebody is consistently tardy or whatever, then I would
12   deal with that person.  You know, a lot of times it'll come
13   to me through residents.  I mean, for example, on our
14   third shift some times people had slept in the past, they
15   would come in and they would, you know, they were trying to
16   fall asleep during their shift.  And if it was brought to my
17   attention by either the other staff person working there or
18   some of the residents themselves, then I would call that
19   individual in and talk to him about what's expected on their
20   job.
21   Q    Okay.  And I take it there would be times when
22   you'd be there between 4:30 and 12:30 and could also spot
23   check to make sure that people were there as they were
24   scheduled?
25   A    I've done that routinely since I've been there.

*APEX Reporting*
(617) 426-3077

1  sheets, what do you mean by that?
2      A    Well, we had his time sheets in like 1998, he may
3  have missed a couple of time sheets. The shift supervisor
4  initialed it, but he didn't sign it. So when I copied them
5  all, I told him to sign them.
6      Q    Okay. So how many did he sign?
7      A    A couple.
8      Q    What's a couple?
9      A    Maybe three. I don't know.
10     Q    Okay. Anybody else sign time sheets, other than
11 Mr. Rodriguez?
12     A    No, I don't think so.
13     Q    Why did you have him sign on the time sheets but
14 not, say, anybody else whose time sheets aren't signed?
15     A    Because he lives there when I was -- he just
16 happened to come in.
17     Q    Okay. But he's the only one that you can think of
18 then that you had do that?
19     A    Yeah.
20     Q    Is it accurate that all of the time sheets that
21 you have produced are true and correct?
22     A    Yes. To the best of my knowledge.
23     Q    To the best of your knowledge, do they all reflect
24 the hours that people have shown up?
25     A    Yes, to the best of my knowledge.

*APEX Reporting*
(617) 426-3077


GOVERNMENT EXHIBIT B