UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CRIM. NO. 04-30032-MAP |
| ) | |
| vs. ) | VIOLATIONS: |
| ) | |
| FRANCIS G. KEOUGH III, ) | 18 U.S.C. §§ 371, 1341 and |
| ANGEL T. GUZMAN, and ) | 1346 - Conspiracy to Commit |
| MICHAEL P. HALLAHAN, ) | Mail Fraud and Theft of Honest |
| ) | Services (Count One) |
| _____Defendants.___ ) | |
| | 18 U.S.C. § 1341 - Mail Fraud (Counts Two through Twenty-Eight) |
| | |
| | 18 U.S.C. § 1951 - Extortion (Count Twenty-Nine) |
| | |
| | 18 U.S.C. § 1503 - Obstruction of Justice (Counts Thirty, Thirty-Three, Thirty-Six, Thirty-Eight, Forty, and Forty-Two) |
| | |
| | 18 U.S.C. § 1001 - Making a False Statement (Counts Thirty-One and Thirty-Two) |
| | |
| | 18 U.S.C. § 1512 - Witness Tampering (Counts Thirty-Four, Thirty-Five, Thirty-Seven, Thirty-Nine, Forty-One, and Forty-Three) |
| | |
| | 18 U.S.C. § 1623(a) - Perjury (Count Forty-Four) |
| | |
| | 18 U.S.C. § 401(3) - Criminal Contempt (Count Forty-Five) |
| | |
| | 26 U.S.C. § 7206(1) - Filing a False U.S. Individual Income Tax Return (Counts Forty-Six through Fifty) |

The Grand Jury charges:

## SECOND SUPERSEDING INDICTMENT

**COUNT 1:**    **Title 18, United States Code, Sections 371, 1341 and 1346 - Conspiracy to Commit Mail Fraud and Theft of Honest Services**

### Introduction

At all times relevant to this Indictment:

1. The United States Department of Housing and Urban Development (hereinafter "HUD") is a federal department of the United States of America and the funding agency for a variety of grants distributed to the City of Springfield. Those grants include, but are not limited to, the Emergency Shelter Grant (hereinafter "ESG"), the Supportive Housing Program (hereinafter "SHP"), and the Community Development Block Grant (hereinafter "CDBG"). The City of Springfield's Office of Housing and Office of Community Development administered these grants as well as others on behalf of HUD and the City of Springfield.

2. The Department of Transitional Assistance (hereinafter "DTA") and Department of Housing and Community Development (hereinafter "DHCD") are departments of the Commonwealth of Massachusetts and funding agencies for a number of homeless shelters and housing organizations throughout the Commonwealth of Massachusetts. DTA entered into rollover service contracts with Friends of the Homeless, Inc. (hereinafter "FOH") that paid for wages and others costs associated with support services for

s

homeless individuals.

3.  The Friends of the Homeless, Inc. (hereinafter "FOH") is a private, non-profit entity that has been operating the Worthington Street Homeless Shelter for almost twenty years. The Worthington Street Homeless Shelter consisted of two buildings located at 769 Worthington Street and 501 Worthington Street. FOH provided emergency beds, food, housing and various social services for the homeless. FOH relied heavily upon the ESG, SHP, and CDBG grants, and the DTA service contracts to fund its payroll and operations.

4.  FOH submitted annual grant applications for funds under the ESG, SHP and CDBG programs to the City of Springfield's Offices of Community Development and Housing. Each year, FOH certified in its annual grant applications to the following fact, among others:

> Does the agency maintain a purchase requisition system, and who authorizes purchases?
>
> The agency does not maintain a purchase requisition system, but for any purchase over $500.00 the agency requires three bids and an approval by the Board of Directors.

In addition, after the City of Springfield approved FOH's grant applications, FOH entered into a contract with the City of Springfield in which FOH agreed to adhere to certain federal rules and regulations, including those provisions outlining

proper procurement procedures and the avoidance of apparent and real conflicts of interest, both organizational and individual.

5.   In addition to the annual applications, FOH also received both federal and state funding for capital improvement projects. For example, on or about October 1, 1998, FOH accepted $125,000.00 in CDBG funds through the City of Springfield's Office of Housing to fund in part renovations of 501 Worthington Street. On or about October 9, 1998, FOH accepted a $308,500.00 loan from DHCD through the Massachusetts Housing Partnership Fund to fund in part the renovations of 501 Worthington Street. FOH accepted these funds subject to federal and state conflict of interest rules, regulations and laws.

6.   Both the City of Springfield and the Commonwealth of Massachusetts funded FOH on a re-imbursement basis under its various funding programs. Once a month, FOH regularly submitted invoices for eligible costs under the ESP, SHP and CDBG grant programs to either the City of Springfield's Office of Housing or the Office of Community Development. FOH attached back-up documentation, such as bills from vendors or FOH employee timesheets, to the invoices to support its requests for re-imbursement for listed expenses and wages. Upon review of the invoices and the supporting documentation and approval, the City of Springfield mailed checks to FOH. Similarly, FOH regularly mailed invoices to DTA or DHCD, which, after review and approval

of the requests for re-imbursement, mailed checks back to FOH.

7. FOH offered rooms and efficiency apartments at 769 Worthington Street and 501 Worthington Street in conjunction with the Springfield Housing Authority (hereinafter "SHA") and the Commonwealth of Massachusetts' MRVP Program. As part of FOH's arrangement with SHA, SHA paid FOH a flat monthly rate for rooms at 769 Worthington Street. FOH determined the prospective tenant's annual income and then calculated that tenant's monthly contribution, if any, towards his or her monthly rent for a room. On a monthly basis, FOH collected the tenants' monthly rental contributions for rooms at 769 Worthington Street and mailed a check to SHA.

8. Among the various social service programs that FOH made available to its residents was the Individual Self-Sufficiency Initiative Program (hereainfter "ISSI Program"), a program funded by HUD. The ISSI program enabled homeless and income-eligible residents to apply for and receive rental assistance in order to obtain apartments through private landlords. FOH residents and program representatives had to certify that the residents were in fact homeless and income-eligible. If the residents satisfied the eligibility criteria, the residents could receive approximately $500.00 per month in rental assistance for one year. Although made available through FOH, the Hampden Hampshire Housing Partnership (hereinafter "HAP") actually administered the

ISSI program. HAP mailed rental checks to the landlords who rented apartments to qualifying applicants under the ISSI Program.

9. Defendant Francis G. Keough III (hereinafter "defendant KEOUGH") was FOH's Executive Director from approximately February, 1994 through approximately January, 2005. Defendant KEOUGH reported to FOH's Board of Directors (hereinafter "FOH Board") and served subject to a contract. Over time, defendant KEOUGH's annual compensation package increased from a salary of $40,000.00 and three weeks of vacation in February 1994 to a salary of $95,000.00, six weeks of vacation, five personal days, a monthly automobile expense allotment of $500.00, payment of automobile insurance, and a bonus at the discretion of the FOH Board, including a performance award of $10,000.00 in January, 2001. Defendant KEOUGH's duties and responsibilities included not only the day to day operations of FOH, but also the overall administration of FOH's budget and finances, including compliance with the federal rules and regulations governing HUD grant recipients. As an employee of FOH, defendant KEOUGH had a fiduciary duty to act in the best interests of FOH.

10. Defendant ANGEL T. GUZMAN (hereinafter "defendant GUZMAN") resided at FOH upon his release from prison for armed robbery in June, 1999. Soon thereafter, defendant KEOUGH gave defendant GUZMAN a job as an intake worker at FOH and promoted

6

defendant GUZMAN to the position of Operations Manager at 501 Worthington by February, 2000. Defendant KEOUGH later obtained a job for defendant GUZMAN at the Hampden County Employment and Training Consortium (hereinafter "HCETC").

11. Defendant MICHAEL P. HALLAHAN (hereinafter "defendant HALLAHAN") began working at FOH as an intake worker in December, 1995. Defendant KEOUGH promoted defendant HALLAHAN to the position of intake supervisor in 1998, a position which defendant HALLAHAN held until 2002. As intake supervisor, defendant HALLAHAN made sure that all of the timesheets of the intake workers were true and accurate and then submitted those timesheets for payroll.

12. 1117-1119 Sumner Avenue is a duplex located in Springfield, Massachusetts. Defendant KEOUGH resided at 1117 Sumner Avenue and rented 1119 Sumner Avenue to tenants. On or about October 1, 2003, defendant KEOUGH transferred ownership to his wife.

13. 24-26 Palmer Avenue is a duplex located in Springfield, Massachusetts. Defendant KEOUGH owned 24-26 Palmer Avenue until he fraudulently sold the property to defendant GUZMAN in March, 2002. Defendant KEOUGH later took the property back and fraudulently re-sold the property to an unindicted co-conspirator in October, 2003.

14. 53-55 Pomona Avenue is a duplex located in

Springfield, Massachusetts. Defendant KEOUGH owned 53-55 Pomona Avenue and rented the property to various tenants over the years. On or about September 22, 2003, defendant KEOUGH transferred ownership to his wife.

15. 59 Oyster Drive is a house located in Charlestown, Rhode Island. Defendant KEOUGH began construction of a new residence at this location in March, 1999 and made material improvements to the property and land through 2001. Defendant KEOUGH transferred ownership of this property to his wife in the fall, 2003.

### The Conspiracy

16. From approximately 1997, the exact beginning date being unknown to the Grand Jury, and continuing thereafter through at least August, 2005, in the District of Massachusetts and elsewhere,

> FRANCIS G. KEOUGH III,
> ANGEL T. GUZMAN,
> and
> MICHAEL P. HALLAHAN,

defendants herein, did unlawfully, willfully, and knowingly combine, conspire, confederate, and agree with each other and other persons both known and unknown to the Grand Jury to commit an offense against the United States; that is, having knowingly and willfully devised a scheme and artifice to defraud FOH, the City of Springfield, the Commonwealth of Massachusetts, HUD, and the public of money and the intangible right to the defendants'

honest services by means of false pretenses, representations, and promises, and material omissions, did knowingly cause to be delivered by the United States Postal Service or any private or commercial interstate carrier, various invoices and checks for the purpose of executing, and attempting to execute, the said scheme and artifice to defraud in violation of Title 18, United States Code, Sections 1341 and 1346.

### The Objects of the Conspiracy

The objects of the conspiracy included, but were not limited to, the following:

17. to fraudulently obtain money, resources, and the intangible right to honest services from FOH, the City of Springfield, the Commonwealth of Massachusetts, HUD, and the public for the personal benefit and enrichment of the defendants;

18. to conceal the fraudulent enrichment of the defendants by submitting and causing the submission of false documentation to FOH, the City of Springfield, the Commonwealth of Massachusetts and HUD in order to obtain re-imbursement for expenses incurred by FOH for the personal benefit of the defendants; and

19. to obstruct the federal grand jury investigation by concealing and attempting to conceal evidence and causing and attempting to cause potential witnesses to make false statements to federal investigators and the grand jury investigation in

order to perpetuate the scheme to defraud.

### The Means and Methods of the Conspiracy

20. Over the years, defendant KEOUGH offered positions on the FOH Board of Directors to individuals so conflicted by personal or business relationships with defendant KEOUGH that the FOH Board ultimately lacked any sense of independence. These conflicts included, but were not limited to:

    a. a board member whose father agreed to allow defendant KEOUGH to receive $50,000.00 in consulting fees from a publicly funded housing project in part for having negotiated a position for the board member as head of the HCETC, and who in turn gave a job to defendant KEOUGH's brother at HCETC;

    b. a board member for whom defendant KEOUGH helped arrange two separate jobs, first at a local non-profit organization and later within the Hampden County court system;

    c. a board member who paid defendant KEOUGH $5,000.00 to negotiate the forgiveness of a Greater Springfield Entrepreneurial Fund loan and the grant of a second such loan, who handled defendant KEOUGH's real estate closings, and whose daughter received a part-time job working at FOH;

    d. a board member for whom defendant KEOUGH obtained a job with the Hampden County House of Correction and later, after the board member expressed dissatisfaction with the job at the jail, with the Springfield Fire Department;

    e. a board member for whom defendant KEOUGH fraudulently obtained one year's worth of rental assistance under the ISSI Program even though the board member was neither homeless nor income eligible; and,

    f. a board member who not only was defendant KEOUGH's tenant at 1119 Sumner Avenue, but also for whom

>    defendant KEOUGH fraudulently obtained one year's worth of rental assistance under the ISSI Program even though the board member was neither homeless nor income eligible.

The net effect of having such a conflicted Board was that the Board exercised virtually no oversight over defendant KEOUGH and voted in accordance with defendant KEOUGH's wishes.

21. Defendant KEOUGH procured goods and services without any competitive bids from friends, family, and political associates and awarded jobs to friends, family, and political associates as a reward for actual or anticipated personal services and favors performed on behalf of defendant KEOUGH.

22. Defendants KEOUGH and GUZMAN recruited residents and inmates on work release at FOH to perform personal work for defendant KEOUGH. Defendant KEOUGH, in turn, provided these individuals with housing at FOH, waived rental obligations due and owing by these individuals, and arranged for jobs both at FOH and elsewhere.

23. Defendants KEOUGH, GUZMAN and HALLAHAN charged personal work performed on FOH time and hours not worked at FOH to FOH. Defendants KEOUGH, GUZMAN and HALLAHAN in turn caused FOH to seek re-imbursement from the City of Springfield, the Commonwealth of Massachusetts and HUD for said hours through the submission of false and fraudulent timesheets.

24. As a reward for their loyalty and complicity in the scheme to defraud, defendant KEOUGH permitted defendants GUZMAN

and HALLAHAN to receive pay for hours not worked at FOH and referred defendants GUZMAN, HALLAHAN and others to an unindicted co-conspirator who worked as a loan officer at a national mortgage company. This corrupt loan officer processed and caused the processing of false and fraudulent loan applications on behalf of defendants KEOUGH, GUZMAN, HALLAHAN and others.

### Overt Acts in Furtherance of the Conspiracy

As a part of and in furtherance of the above-described conspiracy and to accomplish the objects and purposes thereof, defendants herein and their co-conspirators did commit and cause to be committed overt acts, including, but not limited to, the following:

25. On or about May 21, 1997, defendant KEOUGH caused the appointment of a board member for whom defendant KEOUGH had negotiated a position at the HCETC, and who later gave defendant KEOUGH's brother a job at HCETC.

26. On or about July 31, 1997, defendant KEOUGH received $50,000.00 in consulting fees related to the Memorial Parish Housing project in part due to defendant KEOUGH's assistance in arranging a job at HCETC for the son of the former Executive Director of the Springfield Housing Authority.

27. On or about August 1, 1997, defendant KEOUGH used the $50,000.00 payment as a partial payment towards the purchase of a parcel of property at 59 Oyster Drive, Charlestown, Rhode Island

in the name of a nominee.

28. On or about October 1, 1998, defendant KEOUGH certified to the City of Springfield and HUD via the United States mails that FOH accepted $125,000.00 in CDBG funds for the renovations of 501 Worthington Street subject to applicable federal and state conflict of interest laws and other governing rules and regulations.

29. On or about October 9, 1998, defendant KEOUGH certified to DHCD and the Commonwealth of Massachusetts via the United States mails that FOH accepted $308,500.00 in DHCD funds for the renovations of 501 Worthington Street subject to federal and state conflict of interest laws and other governing rules and regulations.

30. On or about February 26, 1999, defendant KEOUGH began charging the building materials for the construction of his Rhode Island residence to the account of the general contractor handling the 501 Worthington Street renovation in order to obtain the contractor's discount, and because defendant KEOUGH did not have the money to purchase the goods and materials at the time.

31. On or about March 30, 1999, defendant KEOUGH caused FOH to pay $1,500.69 in funds dedicated to the 501 Worthington Street renovation project to Home Depot for building materials for the Rhode Island residence.

32. On or about April 7, 1999, defendant KEOUGH received

a bill for $1,815.34 from the electrical sub-contractor handling the 501 Worthington Street renovation for electrical supplies related to the rough wiring of the Rhode Island residence that had been charged to the sub-contractor's account.

33.  On or about April 21, 1999, defendant KEOUGH mailed a letter requesting CDBG funds to the City of Springfield's Department of Housing in which defendant KEOUGH not only re-certified as to the truth and accuracy of the original representations, to include the conflict of interest covenants, in the 501 Worthington Street grant agreement between FOH and the City of Springfield, but also fraudulently billed the City of Springfield for two extra sets of mattresses and frames for the Rhode Island residence.

34.  On or about April 30, 1999, defendant KEOUGH caused the general contractor handling the 501 Worthington Street renovation to make a second payment towards defendant KEOUGH's purchases of building materials on the contractor's account to prevent the suspension of the charge account.

35.  In or about the spring, 1999, defendant KEOUGH permitted an individual to use the FOH van for approximately two weeks so that the individual could travel back and forth between Springfield, Massachusetts and Charlestown, Rhode Island to build defendant KEOUGH's Rhode Island residence.

36.  On or about May 24, 1999, defendant KEOUGH and an

unindicted co-conspirator caused SHA to mail Check No. 1077 for $1,720.00 to Hazelton Heating, Inc. to pay for a boiler, hot water tank, and baseboard heating components installed in the Rhode Island residence.

37. On or about June 7, 1999, defendant KEOUGH mailed a letter requesting funds to DHCD in which defendant KEOUGH certified that the representations, to include the conflict of interest covenants, in the 501 Worthington Street loan agreement between FOH and DHCD remained true, complete and correct.

38. On or about June 7, 1999, defendant KEOUGH mailed a letter requesting CDBG funds to the City of Springfield's Department of Housing in which defendant KEOUGH certified that the representations, to include the conflict of interest covenants, in the 501 Worthington Street grant agreement between FOH and the City of Springfield remained true, complete and correct.

39. On or about July 13, 1999, while on FOH time, defendant KEOUGH assisted an employee of HCETC in drafting a false and fraudulent exculpatory letter to the Springfield Police Department to explain why the employee forgave a $90,000.00 loan issued under the City of Springfield's Home Loan Program on May 8, 1997.

40. In or about August, 1999, defendant KEOUGH awarded the first of a series of no-bid service jobs totaling

approximately $9,900.00 for electrical work at FOH to an electrical contractor who had permitted defendant KEOUGH to order electrical materials for the Rhode Island residence through the contractor's account in order to receive the contractor's discount of fifteen percent on supplies and thirty percent on all light fixtures.

41. On or about September 21, 1999, defendant KEOUGH caused FOH to issue a check for $2,664.60 in funds dedicated to the 501 Worthington Street renovation project to pay for the electrical supplies used at the Rhode Island residence and billed through the account of the 501 Worthington Street electrical sub-contractor.

42. In or about October, 1999, defendant KEOUGH awarded a series of no-bid FOH renovation jobs totaling approximately $12,000.00 to a SHA employee who had served as defendant KEOUGH's unofficial general contractor on the construction of defendant KEOUGH's Rhode Island residence.

43. On or about December 29, 1999, defendant KEOUGH caused FOH to issue a $287.14 re-imbursement check to defendant KEOUGH for costs related to the purchase of a hydronic heater for the Worthington Street Shelter, when in truth this heater had been installed in defendant KEOUGH's Rhode Island residence.

44. Beginning in January, 2000, defendants KEOUGH and GUZMAN caused a FOH employee to travel to the Rhode Island

16

residence and perform work on defendant KEOUGH's personal residence while on FOH time.

45. In or about January, 2000, defendants KEOUGH and HALLAHAN agreed to submit false FOH timesheets for defendant HALLAHAN and another FOH intake employee that inflated the number of hours actually worked.

46. On or about May 24, 2000, defendants KEOUGH, HALLAHAN and GUZMAN caused the City of Springfield to mail a reimbursement check for $13,726.00 for FOH wages that included payment for personal work performed while on FOH time and hours not worked at FOH.

47. Sometime during the summer, 2000, defendant KEOUGH had an unindicted co-conspirator obtain two chainsaws and a wood chipper from SHA so that defendant KEOUGH could have FOH employees and Hampden County House of Correction work release inmates clear brush at his Rhode Island residence.

48. On at least one occasion during the summer, 2000, defendant KEOUGH arranged for the use of a Springfield School Department Food Services van through a part-time FOH intake worker, who worked full-time for the Food Services Department, to transport at least one FOH employee and several Hampden County House of Correction work release inmates to the Rhode Island residence.

49. On at least one occasion during the summer, 2000, at

17

defendant KEOUGH's direction, at least one FOH employee and several Hampden County House of Correction work release inmates traveled to the Rhode Island residence and cleared brush and trees from defendant KEOUGH's property while on FOH time.

50. On at least one occasion during the summer, 2000, at defendant KEOUGH's direction, a FOH employee performed maintenance at 1117-1119 Sumner Avenue, Springfield, MA while on FOH time.

51. On at least one occasion during the summer, 2000, at defendant KEOUGH's direction, a FOH employee performed maintenance at 24-26 Palmer Avenue, Springfield, MA while on FOH time.

52. On at least one occasion during the summer, 2000, at defendant KEOUGH's direction, a FOH employee performed maintenance at 53-55 Palmer Avenue, Springfield, MA while on FOH time.

53. In or about the summer, 2000, defendant KEOUGH caused FOH to order new mattresses for the emergency bed shelter that included mattresses destined for the Rhode Island residence.

54. On or about June 20, 2000, defendant KEOUGH caused the submission of a false and fraudulent ISSI Program application in the name of Tenant A to HAP for a rental unit at 1117 Sumner Avenue, Springfield, MA.

55. On or about June 30, 2000, defendants KEOUGH,

HALLAHAN and GUZMAN caused the City of Springfield to mail a reimbursement check for $3,121.72 for FOH wages that included payment for personal work performed while on FOH time.

56. On or about July 1, 2000, defendant KEOUGH received via the United States mail the first of a series of checks issued under the ISSI Program for rental assistance for Tenant A at 1117 Sumner Avenue, Springfield, Massachusetts.

57. On or about August 22, 2000, defendants KEOUGH, HALLAHAN and GUZMAN caused the City of Springfield to mail a reimbursement check for $7,722.68 for FOH wages that included payment for personal work performed while on FOH time.

58. On or about October 2, 2000, defendants KEOUGH, HALLAHAN and GUZMAN caused the City of Springfield to mail a reimbursement check for $5,807.22 for FOH wages that included payment for personal work performed while on FOH time.

59. On or about November 6, 2000, defendants KEOUGH, HALLAHAN and GUZMAN caused the City of Springfield to mail a reimbursement check for $11,288.56 for FOH wages that included payment for personal work performed while on FOH time.

60. On or about December 28, 2000, defendant KEOUGH had a FOH employee create on FOH time a fraudulent estimate for the replacement of a boiler that had cracked at 1117-1119 Sumner Avenue, Springfield, Massachusetts.

61. In or about 2000 or 2001, defendant KEOUGH caused an

unindicted co-conspirator to steal two refrigerators from SHA that the unindicted co-conspirator eventually delivered to FOH.

62. In or about 2000 or 2001, defendant KEOUGH arranged for the use of a Springfield School Department Food Services van, through the same FOH part-time intake worker, to transport at least one of the stolen refrigerators to the Rhode Island residence.

63. In or about 2000 or 2001, defendant GUZMAN and another FOH employee transported one of the stolen SHA refrigerators in the Springfield School Department Food Services van to the Rhode Island residence while on FOH time.

64. In or about January, 2001, defendants KEOUGH and HALLAHAN continued to process false FOH timesheets for certain intake workers who did personal work and favors for the benefit of defendant KEOUGH and others.

65. On or about February 12, 2001, defendants KEOUGH and GUZMAN caused the submission of a false and fraudulent ISSI Program application in the name of Tenant D to HAP for a rental unit at 87 Longhill Street, Springfield, MA.

66. On or about April 6, 2001, defendant KEOUGH caused the submission of a false and fraudulent ISSI Program application in the name of Tenant B to HAP for a rental unit at 414 Chestnut Street, Springfield, MA.

67. On or about May 1, 2001, defendant KEOUGH caused HAP to

20