```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,      )   CR-N-04-30032-MAP
                               )
            Plaintiff,         )
                               )
      vs.                      )
                               )
FRANCIS G. KEOUGH, et al.,     )
                               )
            Defendants.        )
```

## GOVERNMENT'S RESPONSE TO DEFENDANT KEOUGH'S AND DEFENDANT HALLAHAN'S MOTIONS TO SEVER CO-DEFENDANTS

The United States of America, by and through Michael J. Sullivan, United States Attorney for the District of Massachusetts, and Steven H. Breslow, Assistant United States Attorney, hereby files this response to defendant Francis G. Keough's Motion For Severance Of Defendants Keough & Guzman For Trial (Docket No. 134) and defendant Michael P. Hallahan's Motion To Sever Defendants (Docket No. 116).

Keough bases his motion solely upon a claim that admitting statements that his co-defendant Guzman made to the FBI before his arrest would irreparably prejudice him pursuant to Bruton v. United States, 391 U.S. 123 (1968). However, Guzman is expected to plead guilty, which would moot Keough's motion. In any event, Keough has not demonstrated the actual prejudice required to justify severance.

Hallahan bases his motion upon wholly unspecified claims of prejudice due to antagonistic defenses, relative culpability, and the failure to obtain testimony from his co-defendants who may not testify at the joint trial. Hallahan's motion, too should be denied

because he has not demonstrated the actual prejudice required to justify severance.

Judicial economy will be served best by trying all three defendants together.

I.  Background

   A.  The Government's Indictments

Francis G. Keough, Angel T. Guzman, and Michael P. Hallahan are currently charged in a fifty-count second superseding indictment. All three defendants are charged with conspiracy to commit mail fraud (Count One) and various counts of substantive mail fraud, all in connection with their roles at the Friends of the Homeless, Inc. ("FOH"). Keough ran FOH as the Executive Director, and appointed Guzman to be FOH's Operations Manager and Hallahan to be FOH's Intake Supervisor.

Keough is charged all of the substantive mail fraud counts, which are set forth in Counts 2-28. Guzman is charged in Counts 19-22, 24, 25, and 28, while Hallahan is charged in Count 26.

In addition, Keough is charged with extortion, obstruction of justice, making false statements, witness tampering, perjury, criminal contempt, and tax fraud, all of which relate to his operation of FOH.

   B.  The Mail Fraud Conspiracy (Count 1)

Count One charges Keough, Guzman, and Hallahan with conspiracy to commit mail fraud. The objects of the conspiracy included the following:  to fraudulently obtain money, resources, and the intangible right to honest services from FOH, its governmental

funding agencies, and the public for the personal enrichment of the defendants; to conceal the fraudulent enrichment of the defendants; and to obstruct the federal grand jury investigation.

In part, Keough and Guzman recruited residents and inmates on work release at FOH to perform personal work for Keough. Keough, in turn, provided these individuals with housing at FOH, waived their FOH rental obligations, and arranged for jobs both at FOH and elsewhere.

In addition, Keough, Guzman, and Hallahan charged FOH for both personal work performed on FOH time and hours not worked at FOH. Keough, Guzman, and Hallahan in turn caused FOH to seek reimbursement from the City of Springfield, the Commonwealth of Massachusetts and the United States Department of Housing and Urban Development ("HUD") for these hours through the submission of false and fraudulent timesheets.

From February, 2000 through April, 2000, Hallahan filled out timesheets for another intake worker and himself that stated that they were working three or four shifts per week, when in actuality neither Hallahan nor the other employee worked all of the hours on their timesheets. As the intake supervisor, Hallahan signed the timesheets and attested to their accuracy. Hallahan then submitted the timesheets to FOH's bookkeeper, who issued their weekly payroll checks based upon the hours submitted.

As a reward for their loyalty and complicity in the scheme to defraud, Keough permitted Guzman and Hallahan to receive pay for hours not worked at FOH and referred them to an unindicted co-

conspirator who worked as a loan officer at a national mortgage company. This corrupt loan officer processed fraudulent loan applications on behalf of defendants Keough, Guzman, and Hallahan. These frauds are charged in Counts 24-25 (Guzman) and Count 26 (Hallahan), set forth below at page 8.

> C. Mail Fraud Involving The Wages Of Keough, Guzman, Hallahan, And Others (Counts 2 - 13)

Counts 2-13 involve the mailings of reimbursement checks to FOH that in part paid for the salary of Keough, Guzman, Hallahan, and others. Like all FOH employees, Keough, Guzman, and Hallahan had to fill out a weekly timesheet certifying that they had worked forty hours per week. The timesheets eventually were attached to FOH's reimbursements requests that were sent to the City of Springfield or the Commonwealth of Massachusetts, which then mailed payment back to FOH.

By approximately 2001, Keough generally spent only four hours of his day at FOH, even though he routinely submitted timesheets stating that he worked from 8:30 a.m. to 4:30 p.m. throughout 2002-2004. In particular, during the 2003 campaign for Springfield's mayor, in which Keough worked as a campaign manager for a candidate, he rarely showed up at work from the middle of August, 2003 through November, 2003, even though his timesheets showed that he worked at least twenty hours per week throughout those months.

In addition, Keough used FOH workers, including Guzman, to perform work on FOH time at his vacation home in Charlestown, Rhode Island. Keough often drove the workers or permitted them to use his Jeep or the FOH van, and Hallahan signed their timesheets attesting

to the accuracy of their hours. Keough similarly arranged for FOH workers to perform maintenance work on his personal residence at 1117 Sumner Avenue in Springfield, MA and his two rental properties at 24-126 Palmer Avenue and 53-55 Pomona Street, also in Springfield, MA. This maintenance work consisted of routine maintenance, painting, landscaping, and other tasks. At least one worker estimated that from 2000 through 2003, he spent thirty percent of his FOH time working for Keough personally.

D.   Mail Fraud Involving No-Bid Contracts (Counts 14 -16)

FOH submitted an annual grant application for HUD funds from the City of Springfield's Office of Community Development. Each year, FOH attested to the following fact in its application: "The agency does not maintain a purchase requisition system, but for any purchase over $500.00 the agency requires three bids and an approval by the Board of Directors." Either Keough or a board member signed the attestation.

However, Keough routinely ordered that FOH purchase certain goods or services exceeding $500.00 from friends or relatives without obtaining the required three bids. Such vendors included Mansfield Paper Co., whose president is Keough's brother-in-law; Daniel McNamee, who acted as Keough's informal general contractor for the Rhode Island house; and Quinn Electrical Co., which was owned by a friend of Keough's and which purchased electrical supplies for Keough in order to obtain the contractor of 15-30% discount for him.

Each of the mailings in Counts 14-16 involved reimbursement checks from the City of Springfield that were funded by HUD, which checks paid in part for supplies purchased from Mansfield Paper Co. without the competitive bidding process.

E.    Mail Fraud Involving ISSI Diversion (Counts 17-22)

FOH offered its residents a program called the ISSI program. The ISSI program enabled homeless residents to apply for and receive rental assistance so that they could obtain apartments through private landlords. FOH residents and program representatives had to certify that the residents were in fact homeless and income eligible. If the residents satisfied the eligibility criteria, the residents would obtain an apartment and then receive approximately $500.00 per month in rental assistance for one year. HUD funded this program through HAP, the Hampden Housing Alliance Partnership.

Keough, along with the assistance of Guzman and others, falsely certified that a number of individuals were homeless and income eligible through the ISSI program. Several of these individuals were already tenants of Keough at the following premises: 1119 Sumner Avenue (Tenant A in Count 17); 24 Palmer Avenue (Tenant C in Count 19); 26 Palmer Avenue (Tenant E in Count 21); 24-26 Palmer Avenue (Tenant F) (Count 22)[1]. Keough fraudulently received rental payments through the ISSI program or assisted individuals in

---

[1] Keough continued to receive ISSI checks even after he ostensibly sold Palmer Avenue to Guzman on March 18, 2002. See Count 24, discussed at page 8.

6

obtaining rental assistance.[2]  HAP mailed all of its rental checks to Keough, thus establishing the use of the mails.

    F.    <u>Mail Fraud Involving Insurance Fraud (Count 23)</u>

On or about December 26, 2000, Keough reported to his insurance carrier, Union Mutual, that his boiler at 1117-1119 Sumner Avenue had cracked.  Union Mutual arranged to have an appraiser inspect the boiler, and the appraiser verified the claim.  Union Mutual subsequently agreed to cover the claim.  Keough instructed an FOH employee to replace the boiler.  The FOH employee received $2,000.00 in cash from Keough to purchase a boiler from a local plumbing supply company.  The FOH employee then installed the boiler on FOH time.  Keough did not pay the FOH employee for his services.

Union Mutual subsequently asked Keough for copies of the bills incurred to replace the boiler in order to process his claim.  Finally, on May 8, 2001, Union Mutual received three bills:  a bill for $3,300.00 from Thomas W. Smith General Contractor; $1,800.00 from Cote's Asbestos Removal; and $557.50 from Quinn Electrical.  However, all of the bills were fraudulent.  On May 17, 2001, Union Mutual mailed a $5,200.31 check for these bills to Keough, who deposited the check into his personal account.

    G.    <u>Mail Fraud Involving Fraudulent Bank Loans (Counts 24-26)</u>

---

[2]  Tenant B in Count 18 rented an apartment that was not owned by Keough.  However, after arranging for Tenant B to receive ISSI assistance to which Tenant B was not entitled, Keough later asked Tenant B to join FOH's Board of Directors in 2002.

Count 24.  Count 24 charges Keough and Guzman with mail fraud in connection with Keough's sale to Guzman of 24-26 Palmer Avenue in March, 2002.  Guzman obtained his loan for 24-26 Palmer Avenue from New Century Mortgage Corporation.  According to the loan file, Guzman obtained a loan for $77,350.00 as a partial payment towards the $91,000.00 purchase price.  Guzman completed a loan application in which he reported monthly income of $5,000.00 per month as an operations manager at FOH and $14,000.00 in savings at United Cooperative Bank.  However, Guzman earned approximately $2,000.00 per month at FOH and did not have a bank account at United Cooperative Bank.

Guzman's loan file contains a letter purportedly signed by Christine Packer of United Cooperative Bank verifying that Guzman had a balance of $14,000.  In fact, Keough directed his FOH secretary, Pat Walker, to type a blank letter stating that Guzman had a balance of $14,000, which Keough then copied onto United Cooperative Bank letterhead.  Keough then directed a homeless FOH resident to forge the signature of Christine Packer onto the letter.  The forged United Cooperative Bank letter actually bears the Friends of the Homeless fascimile number and name at the top of the letter.  Keough earned a $14,350.00 net profit on the deal.

Count 25.  Count 25 charges Keough and Guzman with mail fraud in connection with Guzman's sale of 24-26 Palmer Avenue in October, 2003.  Shortly after Guzman purchased the property, Guzman fell

behind on his monthly payments. Keough took the property back and collected the rental payments from the tenants residing at Palmer Avenue, including tenants receiving ISSI assistance. Keough also had an FOH employee perform maintenance and other repairs on the property. Ultimately, Keough convinced his friend, Michael Tourville, the branch manager at Countrywide Home Loans, to buy the property from Keough.

On October 3, 2003, Tourville purchased 24-26 Palmer Avenue, ostensibly from Guzman, after obtaining a $104,000.00 mortgage loan through Countrywide Home Loans. According to the HUD Settlement Statement, Tourville owed Guzman $31,671.89 at the time of the closing, and Guzman should have received $44,994.64 from the sale of the property. At the closing, Countrywide wired $104,000.00 into an attorney's IOLTA account, which in turn issued a $44,994.64 IOLTA check to Angel Guzman, who endorsed the entire amount over to Tourville. Tourville deposited the $44,994.64 check into his personal account and approximately a month later, Tourville issued a cashier's check to Keough for $13,000.00.

Thus, Keough earned a profit twice on the same piece of property, using Guzman as the nominee on the second transaction. Keough did not report either capital gain on his income tax returns.

Count 26. Count 26 charges Keough and Hallahan with mail fraud in connection with the sale of 5 Desrosiers Street in July, 2004. Hallahan's loan application contained several material falsities,

including an overstatement of his bank account (which was historically overdrafted and contained a balance of 52 cents). After the purchase, Keough arranged for FOH employees to spread mulch, scrape, and paint at the property.

> H.  Mail Fraud Involving Rent Waivers
>     In Return For Sexual Favors (Counts 27, 28)

With the Springfield Housing Authority ("SHA"), FOH offered rooms and efficiency apartments at two shelters located at 769 Worthington Street and 501 Worthington Street. Eligible tenants at these shelters had to pay only a portion of their rent, depending upon their annual income.[3]

However, Keough waived rental obligations for certain tenants who either provided him with free services, such as labor at his personal or rental properties, or with whom he had a sexual relationship. Female Resident A and Female Resident B were two such individuals who did not have to pay rent because they shared a sexual relationship with him.

---

[3] At 769 Worthington Street, SHA paid FOH a flat monthly rate for rooms. FOH determined the prospective tenant's annual income and then calculated that tenant's monthly contribution, if any, towards his or her monthly rent for a room. On a monthly basis, FOH collected the tenant's monthly rental contributions for rooms at 769 Worthington Street and mailed a check to SHA.
   At 501 Worthington Street, SHA determined the tenant's annual income and calculated that tenant's monthly contribution, if any, towards the monthly rent. SHA then reduced the monthly payments accordingly. Therefore, FOH collected the tenant's monthly rental contributions and kept the proceeds rather than sending them to SHA.

Count 27 / Female Resident A. Shortly after Female Resident A moved into FOH's 769 Worthington Street residence, Keough visited her room and solicited oral sex, which she provided because she felt obligated to do so. Thereafter, Keough solicited oral sex from her on a regular basis for the next several months, and then gave her a job at FOH.

By late January, 2001, Female Resident A was earning approximately $200.00 per week at FOH. Despite the fact that Keough knew that she now received income, Keough instructed FOH employees not to bill her for any rent. The FOH employees billed her anyway, but Keough told her to ignore the bills. Therefore, SHA never received any of her contributions towards rent for the months of January, 2002 and February, 2002.

In March, 2002, Keough moved Female Resident A to an efficiency apartment at 501 Worthington, ahead of the waiting list that existed for the newly opened unit. By this time, Keough and she were having sexual intercourse on a regular basis. Once again, although she still had her job at FOH, she did not have to pay any rent for her unit at 501 Worthington.

Count 28 / Female Resident B. Female Resident B began residing at 769 Worthington Street on April 30, 2002. Keough told her that she would have to pay rent only if she received income. Soon after residing at FOH, Guzman solicited oral sex from her, which she felt compelled to provide due to his position at FOH. She performed oral

11

sex on Guzman several times per week thereafter. Around the same time, Keough took her back to his home at 1117-1119 Sumner Avenue and initiated a sexual relationship with her.

Also several weeks after residing at FOH, Female Resident B got a job at a nearby club, and began to receive cash income that ranged from several hundred dollars to a thousand dollars a night.[4] Keough and told her not to report the club income. After FOH employees learned about her job, one employee told Keough that she should be paying more rent. Keough responded that unverified cash income did not qualify as income, and therefore, did not have to be reported. Therefore, FOH never adjusted her rental contribution and never collected any additional rent from her.

   I.   Angel Guzman's Pre-Arrest Statement

Guzman is expected to plead guilty on or before December 4, 2006. However, if Guzman were to proceed to trial, the government would seek to introduce into evidence certain statements made by Guzman to FBI agents during a consensual interview on May 6, 2006.[5]

These statements include statements that: Guzman and others, including FOH tenants and employees, worked at Keough's Rhode Island home; Guzman and others were occasionally transported to the Rhode Island home in an FOH vehicle; Guzman rented an apartment owned by

---

[4] At the same time, Female Resident B began to receive SSI disability payments and was charged by FOH a monthly contribution of $191.00 per month.

[5] The report of this interview is attached hereto as Exhibit 1.

12

Keough on Palmer Avenue in 2000; Ivan Devila and Lydia LNU also lived at an apartment on 26 Palmer Avenue and paid rent to Keough; Guzman purchased a home from Keough by obtaining a loan through Michael Tourville; Guzman refinanced the home as Keough suggested, with a forged bank letter prepared in part by Keough's secretary, Pat Walker; and Keough later arranged for Guzman to sell the home to Tourville, but he never received any money from the sale.

II. <u>Principles of Law</u>

In the First Circuit, it is well-settled that "those 'who are indicted together should be tried together.'" <u>United States v. DeLeon</u>, 187 F.3d 60, 63 (1st Cir. 2001) (quoting <u>United States v. O'Bryant</u>, 998 F.2d 21, 25 (1st Cir. 1993)). <u>See</u> also <u>United States v. Capleton</u>, 350 F.3d 231, 239 (1st Cir. 2004) (reaffirming general rule that "'defendants charged in the same indictment should be tried together.'") (quoting <u>United States v. Houle</u>, 237 F.3d 71, 76 (1st Cir. 2001)); <u>United States v. Sotomayor-Vazquez</u>, 249 F.3d 1, 16-17 (1st Cir. 2001) (stating that "[t]here is a strong preference in the federal system for jointly trying defendants involved in related crimes.").

"'The federal courts have long recognized that consolidated trials tend to promote judicial economy, conserve prosecutorial resources, and foster the consistent resolution of factual disputes common to properly joined defendants.'" <u>United States v. DeLuca</u>, 137 F.3d 24, 36 (1st Cir. 1999) (quoting <u>United States v. Josleyn</u>, 99 F.3d 1182, 1188 (1st Cir. 1996)).

To prevail upon a severance motion based upon a claim of prejudicial spillover, "a defendant must show that the joinder of offenses here resulted in 'actual prejudice,' which we define as the 'substantial and injurious effect or influence in determining the jury's verdict.'" <u>United States v. Melendez</u>, 301 F.3d 27, 36 (1st Cir. 2003) (quoting <u>United States v. Edgar</u>, 82 F.3d 499, 508 (1st

14

Cir. 1996)).  To overcome the district court's presumption in favor of joinder, the prejudice must be "so pervasive that it would be likely to effect a miscarriage of justice."  DeLeon, 187 F.3d at 63 (citing United States v. Pierro, 32 F.3d 611, 615 (1st Cir. 1994)). In other words, there must be a "'a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence.'"  Sotomayor-Vazquez, 249 F.3d at 16-17 (quoting Zafiro, 506 U.S. at 539).

"This requirement means more than establishing that the defendant might have had a better chance of acquittal in a separate trial."  DeLeon, 187 F.3d at 63 (citing Zafiro, 506 U.S. at 540). A defendant "is not entitled to severance merely because he may have a better chance of acquittal if tried separately." United States v. Rogers, 121 F.3d 12, 16 (1st Cir. 1997) (citing Zafiro, 506 U.S. at 540).

The First Circuit reverses "a decision to deny a motion for severance only upon a showing of strong prejudice, demonstrating a manifest abuse of discretion that deprived the defendant of a fair trial."  United States v. Nason, 9 F.3d 155, 158 (1st Cir. 1993).

III. Argument

As set forth below, the defendants' motions should be denied because each defendant fails to establish actual prejudice resulting from a joint trial.

    A.   Hallahan Fails To Show Actual Prejudice

15

Hallahan bases his motion upon wholly unspecified claims of prejudice due to antagonistic defenses, relative culpability, and the failure to obtain testimony from his co-defendants who may not testify at the joint trial. None of these unsubstantiated arguments outweighs the concerns for judicial economy and the First Circuit's strong preference for a joint trial.

    1.    Hallahan Has Not Shown That His Defenses Are Mutually Antagonistic With His Co-Defendants' Defenses

To succeed with a motion for severance based upon antagonistic defenses, a defendant must demonstrate "that the defenses are so irreconcilable as to involve fundamental disagreement over core and basic facts." Capleton, 350 F.3d at 239 (citing United States v. Pena-Lora, 225 F.3d 17, 34 (1st Cir. 2000)). The mere fact "that two defendants assert antagonistic defenses does not per se require severance even if the defendants are hostile or attempt to cast the blame on each other." United States v. Paradis 802 F.2d 553, 561 (1st Cir. 1986). Similarly, the fact that defendants "presented somewhat antagonistic defenses" does not warrant a severance. United States v. Serafino, 281 F.3d 327, 329 (1st Cir. 2002). Instead, "antagonistic defenses only require severance if the tensions between the defenses are so great that the finder of fact would have to believe one defendant at the expense of the other." Unites States v. Rose, 104 F.3d 1408, 1415 (1st Cir. 1997) (citing Smith, 46 F.3d 1223, 1230 (1st Cir. 1994)).

Hallahan's argument fails because it is entirely uncertain what his, Guzman's, or Keough's defenses at trial will be. Hallahan's two-page motion simply asserts, conclusorily and without elaboration, that "it is anticipated" that his defense will be "irreconcilably antagonistic" with his co-defendants' defenses. Motion, at 1, ¶¶ 2-3.

Similarly, Hallahan's two-page Memorandum of Law devotes only two sentences to his argument, and cites only to a Ninth Circuit case, United States v. Tootick, 952 F.2d 1078, 1083 (9th Cir. 1991) to support his argument that the Court should "sever defendants who have mutually exclusive defenses so long as there exists clear and manifest prejudice." Memo, at 2.

In Tootick, the defendants clearly offered such defenses warranting severance. There, only the two defendants were present when a third man was stabbed, and "the principle defense of each defendant was that the other alone committed the assaults." United States v. Tootick, 952 F.2d at 1081. Moreover, "[t]he government's closing argument, not surprisingly, rested on the logical impossibility of accepting both defendants at their word." Id. at 1085. Lastly, the Court failed to issue cautioning instructions after "the damaging opening statements of defense counsel," as defense counsel "acted as unsanctioned prosecutors during the course of the trial," and as "the prosecutor relied upon the mutually

17

exclusive nature of the co-defendants' defenses in an effort to nail down their mutual guilt in his closing argument." Id.

Here, Hallahan has not made any showing, much less a strong or substantial showing, that his defenses would be so antagonistic to either Keough or Guzman as to warrant severance. If their defenses are only different, or even somewhat antagonistic, severance would still be inappropriate. Rogers, 121 F.3d at 16 (affirming denial of motion for severance were defenses were "not antagonistic, merely different."); Serafino, 281 F.3d at 329 (affirming denial of motion for severance where defenses merely "somewhat antagonistic.").

Finally, the district court can protect against the possibility of spillover prejudice by instructing the jury to consider the evidence separately as to each charge and each defendant. See Houle, 237 F.3d at 76; Rogers, 121 F.3d at 16 (stating that the district court "scrupulously instructed the jurors that they must consider the evidence as to each charge and each defendant separately."); compare Tootick, 952 F.2d at 1085 (no instructions).

> 2.  Hallahan Has Not Made A Sufficient Showing That His Co-Defendants Will Testify, That Their Testimony Will Be Exculpatory, Or That His Need For Their Testimony Outweighs Judicial Economy Concerns

Where a defendant seeks a severance based upon the need to present the exculpatory testimony of a co-defendant, "a defendant must show that the proffered testimony is genuinely necessary, exculpatory, and will in fact be forthcoming in a severed trial."

United States v. Hurley, 63 F.3d 1, 17 (1st Cir. 1995) (citing United States v. Drougas, 748 F.2d 8, 19 (1st Cir. 1984)).  To make such a showing, the defendant initially must demonstrate the "first-tier Drougas factors":  "(1) a bona fide need for the testimony; (2) the substance of the testimony; (3) its exculpatory nature and effect; and (4) that the co-defendant will in fact testify if the cases are severed."  Smith, 46 F.3d at 1231; Nason, 9 F.3d at 158.

Assuming that a defendant makes the first showing, the district court then must consider the "second-tier Drougas factors." Id.  To establish the second-tier Drougas factors, "the district court should (1) examine the significance of the testimony in relation to the defendant's theory of defense; (2) consider whether the testimony would be subject to substantial, damaging impeachment; (3) assess the counter arguments of judicial economy; and (4) give weight to the timeliness of the motion." Id.; Nason, 9 F.3d at 158.

Hallahan's motion should be denied because it is woefully inadequate as a matter of law.  First, Hallahan has not demonstrated that Keough and/or Guzman in fact would testify or what their expected testimony would be.  For example, Hallahan has not filed an affidavit from either of his co-defendants stating that they in fact would testify for him at a separate trial.  See Nason, 9 F.3d at 159 (affirming denial of motion for severance because defendant never filed an affidavit from either co-defendant showing that they would testify for co-defendant at a separate trial.).  See also Drougas,

19

748 F.2d at 19; Font-Ramirez, 944 F.2d at 45. Alternatively, Hallahan never filed an affidavit from either of his co-defendants' counsel representing that their clients would in fact would testify for him at a separate trial. See Nason, 9 F.3d at 159.

Instead, Hallahan simply filed the instant motion, unaccompanied by any affidavits, in which Hallahan's defense counsel merely asserted that "it is anticipated" that Hallahan would be "denied exculpatory evidence in the form of testimony from his co-defendants who *may* not testify in a joint trial." Motion, at page 1, ¶ 5 (emphasis added). Moreover, Hallahan has not outlined his co-defendants "anticipated" *potential* testimony in any fashion, outside of conclusorily characterizing it as "exculpatory." Id. See Smith, 46 F.3d at 1232 (citing Ford, 870 F.2d at 732) (holding that conclusory statements did not meet burden of establishing the exculpatory 'nature and effect' of the co-defendant's testimony)).

Given the lack of any sworn affidavits, the complete failure to outline his co-defendants' testimony, and the conclusory nature of the "expected" testimony, the court should deny Hallahan's motion as a matter of law. The First Circuit has denied severance on far greater showings. See United States v. Hurley, 63 F.3d 1, 17 (1st Cir. 1995)(co-defendant's proffered testimony that defendant lacked knowledge about money laundering, i.e. defendant "was not to be told anything except that he was working for a gold dealer," found not sufficiently exculpatory to warrant a severed trial).

20