UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CR-N-04-30032-MAP |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| FRANCIS G. KEOUGH, et al., ) | |
| ) | |
| Defendants. ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT KEOUGH'S
MOTIONS TO SEVER COUNTS 27-28, 31-45, AND 45-50
FROM THE SECOND SUPERSEDING INDICTMENT**

The United States of America, by and through Michael J. Sullivan, United States Attorney for the District of Massachusetts, and Steven H. Breslow, Assistant United States Attorney, hereby files this response to defendant Francis G. Keough's Motions To Sever Counts 27-28, 31-45, And 45-50 From The Second Superseding Indictment (Docket Nos. 127 and 137). These motions should be denied as meritless.

I. Background

    A.   The Government's Indictment

Keough is currently charged in a fifty-count second superseding indictment charging him with conspiracy to commit mail fraud (Count One), substantive mail fraud (Counts 2-28), extortion (Count 29), obstruction of justice (Counts 30, 33, 36, 38, 40, and 42), making false statements (Counts 31 and 32), witness tampering (Counts 34,

1

35, 37, 39, 41, and 43), perjury (Count 44), criminal contempt (Count 45), and filing false income tax returns (Counts 46-50), all in connection with his role as Executive Director of Friends of the Homeless ("FOH"), a non-profit organization based in Springfield, MA.

In addition, the second superseding indictment charges two defendants, Angel T. Guzman, the former operations manager at the Worthington Street Homeless Shelter, and Michael P. Hallahan, the former intake supervisor, with conspiracy to commit mail fraud (Count One) and substantive mail fraud (Counts 19-22, 24, 25, and 28 for Guzman and Count 26 for Hallahan).

B. Facts

1. Keough's Conspiracy and Substantive Mail Frauds (Counts 1-28)

   a. Count One

Count One charges Keough, Guzman, and Hallahan with conspiracy to commit mail fraud. The objects of the conspiracy included the following: to fraudulently obtain money, resources, and the intangible right to honest services from FOH, the City of Springfield, the Commonwealth of Massachusetts, HUD, and the public for the personal enrichment of the defendants; to conceal the fraudulent enrichment of the defendants; and to obstruct the federal grand jury investigation.

In part, Keough and Guzman recruited residents and inmates on work release at FOH to perform personal work for Keough. Keough, in

turn, provided these individuals with housing at FOH, waived their FOH rental obligations, and arranged for jobs both at FOH and elsewhere.

In addition, Keough, Guzman, and Hallahan charged FOH for both personal work performed on FOH time and hours not worked at FOH. Keough, Guzman, and Hallahan in turn caused FOH to seek reimbursement from the City of Springfield, the Commonwealth of Massachusetts and the United States Department of Housing and Urban Development ("HUD") for these hours through the submission of false and fraudulent timesheets.

As a reward for their loyalty and complicity in the scheme to defraud, Keough permitted Guzman and Hallahan to receive pay for hours not worked at FOH and referred them to an unindicted co-conspirator who worked as a loan officer at a national mortgage company. This corrupt loan officer processed fraudulent loan applications on behalf of defendants Keough, Guzman, and Hallahan.

Keough engaged in other fraudulent conduct, including thefts from FOH that were charged as overt acts in furtherance of the conspiracy. For example, from March, 1999 through June, 1999, Keough purchased $2,664.00 in electrical supplies for his Rhode Island house through Universal Electric, which was the electrical subcontractor during the renovation of an FOH shelter. On September 21, 1999, FOH issued a check for $2,664.00 to Universal Electric to pay for those supplies. Keough falsely represented to FOH's

business manager that the $2,664.00 check was payment for electrical repairs to FOH's soup kitchen.  Similarly, on December 27, 1999, FOH issued a $287.14 check to Keough as reimbursement for costs related to the purchase of a hydronic heater for an FOH shelter.  However, this shelter does not have a hydronic heater, which was installed instead at Keough's vacation home in Rhode Island.  Lastly, Keough caused FOH to purchase mattresses and televisions that he arranged to be transported to his vacation home in Rhode Island.

        b.    Mail Fraud Involving The Wages Of Keough, Guzman, Hallahan, And Others (Counts 2 - 13)

Counts 2-13 involve the mailings of reimbursement checks to FOH that in part paid for the salary of Keough, Guzman, Hallahan, and others.  Like all FOH employees, Keough, Guzman, and Hallahan had to fill out a weekly timesheet certifying that they had worked forty hours per week.  The timesheets eventually were attached to FOH's reimbursements requests that were sent to the City of Springfield or the Commonwealth of Massachusetts, which then mailed payment back to FOH.

By approximately 2001, Keough generally spent only four hours of his day at FOH, even though he routinely submitted timesheets stating that he worked from 8:30 a.m. to 4:30 p.m. throughout 2002-2004.  In particular, during the 2003 campaign for Springfield's mayor, in which Keough worked as a campaign manager for a candidate, he rarely showed up at work from the middle of August, 2003 through

November, 2003, even though his timesheets showed that he worked at least twenty hours per week throughout those months.

In addition, Keough used FOH workers, including Guzman, to perform work on FOH time at his vacation home in Charlestown, Rhode Island. Keough often drove the workers or permitted them to use his Jeep or the FOH van, and Hallahan signed their timesheets attesting to the accuracy of their hours. Keough similarly arranged for FOH workers to perform maintenance work on his personal residence at 1117 Sumner Avenue in Springfield, MA and his two rental properties at 24-126 Palmer Avenue and 53-55 Pomona Street, also in Springfield, MA. This maintenance work consisted of routine maintenance, painting, landscaping, and other tasks. At least one worker estimated that from 2000 through 2003, he spent thirty percent of his FOH time working for Keough personally.

    c. <u>Mail Fraud Involving No-Bid Contracts (Counts 14 -16)</u>

FOH submitted an annual grant application for HUD funds from the City of Springfield's Office of Community Development. Each year, FOH attested to the following fact in its application: "The agency does not maintain a purchase requisition system, but for any purchase over $500.00 the agency requires three bids and an approval by the Board of Directors." Either Keough or a board member signed the attestation.

However, Keough routinely ordered that FOH purchase certain goods or services exceeding $500.00 from friends or relatives

5

without obtaining the required three bids. Such vendors included Mansfield Paper Co., whose president is Keough's brother-in-law; Daniel McNamee, who acted as Keough's informal general contractor for the Rhode Island house; and Quinn Electrical Co., which was owned by a friend of Keough's and which purchased electrical supplies for Keough in order to obtain the contractor of 15-30% discount for him.

Each of the mailings in Counts 14-16 involved reimbursement checks from the City of Springfield that were funded by HUD, which checks paid in part for supplies purchased from Mansfield Paper Co. without the competitive bidding process.

      d.   <u>Mail Fraud Involving ISSI Diversion (Counts 17-22)</u>

FOH offered its residents a program called the ISSI program. The ISSI program enabled homeless residents to apply for and receive rental assistance so that they could obtain apartments through private landlords. FOH residents and program representatives had to certify that the residents were in fact homeless and income eligible. If the residents satisfied the eligibility criteria, the residents would obtain an apartment and then receive approximately $500.00 per month in rental assistance for one year. HUD funded this program through HAP, the Hampden Housing Alliance Partnership.

Keough, along with the assistance of Guzman and others, falsely certified that a number of individuals were homeless and income eligible through the ISSI program. Several of these individuals

were already tenants of Keough at the following premises: 1119 Sumner Avenue (Tenant A in Count 17); 24 Palmer Avenue (Tenant C in Count 19); 26 Palmer Avenue (Tenant E in Count 21); 24-26 Palmer Avenue (Tenant F) (Count 22)[1]. Keough fraudulently received rental payments through the ISSI program or assisted individuals in obtaining rental assistance.[2] HAP mailed all of its rental checks to Keough, thus establishing the use of the mails.

     e.    Mail Fraud Involving Insurance Fraud (Count 23)

On or about December 26, 2000, Keough reported to his insurance carrier, Union Mutual, that his boiler at 1117-1119 Sumner Avenue had cracked. Union Mutual arranged to have an appraiser inspect the boiler, and the appraiser verified the claim. Union Mutual subsequently agreed to cover the claim. Keough instructed an FOH employee to replace the boiler. The FOH employee received $2,000.00 in cash from Keough to purchase a boiler from a local plumbing supply company. The FOH employee then installed the boiler on FOH time. Keough did not pay the FOH employee for his services.

Union Mutual subsequently asked Keough for copies of the bills incurred to replace the boiler in order to process his claim.

---

[1] Keough continued to receive ISSI checks even after he ostensibly sold Palmer Avenue to Guzman on March 18, 2002. See Count 24, discussed at page 8.

[2] Tenant B in Count 18 rented an apartment that was not owned by Keough. However, after arranging for Tenant B to receive ISSI assistance to which Tenant B was not entitled, Keough later asked Tenant B to join FOH's Board of Directors in 2002.

Finally, on May 8, 2001, Union Mutual received three bills: a bill for $3,300.00 from Thomas W. Smith General Contractor; $1,800.00 from Cote's Asbestos Removal; and $557.50 from Quinn Electrical. However, all of the bills were fraudulent. On May 17, 2001, Union Mutual mailed a check for $5,200.31, which subtracted Keough's $250.00 deductible, to Keough, who deposited the check into his personal account.

      f.    Mail Fraud Involving Fraudulent Bank Loans (Counts 24-26)

Count 24. Count 24 charges Keough and Guzman with mail fraud in connection with Keough's sale to Guzman of 24-26 Palmer Avenue in March, 2002. Guzman obtained his loan for 24-26 Palmer Avenue from New Century Mortgage Corporation. According to the loan file, Guzman obtained a loan for $77,350.00 as a partial payment towards the $91,000.00 purchase price. Guzman completed a loan application in which he reported monthly income of $5,000.00 per month as an operations manager at FOH and $14,000.00 in savings at United Cooperative Bank. However, Guzman earned approximately $2,000.00 per month at FOH and did not have a bank account at United Cooperative Bank.

Guzman's loan file contains a letter purportedly signed by Christine Packer of United Cooperative Bank verifying that Guzman had a balance of $14,000. In fact, Keough directed his FOH secretary to type a blank letter stating that Guzman had a balance of $14,000, which Keough then copied onto United Cooperative Bank

8

letterhead.  Keough then directed a homeless FOH resident to forge the signature of Christine Packer onto the letter.  The forged United Cooperative Bank letter actually bears the Friends of the Homeless fascimile number and name at the top of the letter.  Keough earned a $14,350.00 net profit on the deal.

Count 25.  Count 25 charges Keough and Guzman with mail fraud in connection with Guzman's sale of 24-26 Palmer Avenue in October, 2003.  Shortly after Guzman purchased the property, Guzman fell behind on his monthly payments.  Keough took the property back and collected the rental payments from the tenants residing at Palmer Avenue, including tenants receiving ISSI assistance.  Keough also had an FOH employee perform maintenance and other repairs on the property.  Ultimately, Keough convinced his friend, Michael Tourville, the branch manager at Countrywide Home Loans, to buy the property from Keough.

On October 3, 2003, Tourville purchased 24-26 Palmer Avenue, ostensibly from Guzman, after obtaining a $104,000.00 mortgage loan through Countrywide Home Loans.  According to the HUD Settlement Statement, Tourville owed Guzman $31,671.89 at the time of the closing, and Guzman should have received $44,994.64 from the sale of the property.  At the closing, Countrywide wired $104,000.00 into an attorney's IOLTA account, which in turn issued a $44,994.64 IOLTA check to Angel Guzman, who endorsed the entire amount over to Tourville.  Tourville deposited the $44,994.64 check into his

9

personal account and approximately a month later, Tourville issued a cashier's check to Keough for $13,000.00.

Thus, Keough earned a profit twice on the same piece of property, using Guzman as the nominee on the second transaction. Keough did not report either capital gain on his income tax returns.

<u>Count 26</u>.  Count 26 charges Keough and Hallahan with mail fraud in connection with the sale of 5 Desrosiers Street in July, 2004. Hallahan's loan application contained several material falsities, including an overstatement of his bank account (which was historically overdrafted and contained a balance of 52 cents). After the purchase, Keough arranged for FOH employees to spread mulch, scrape, and paint at the property.

       g.    Mail Fraud Involving Rent Waivers
           <u>In Return For Sexual Favors (Counts 27, 28)</u>

With the Springfield Housing Authority ("SHA"), FOH offered rooms and efficiency apartments at two shelters located at 769 Worthington Street and 501 Worthington Street.  Eligible tenants at these shelters had to pay only a portion of their rent, depending upon their annual income.[3]

---

[3]  At 769 Worthington Street, SHA paid FOH a flat monthly rate for rooms.  FOH determined the prospective tenant's annual income and then calculated that tenant's monthly contribution, if any, towards his or her monthly rent for a room.  On a monthly basis, FOH collected the tenant's monthly rental contributions for rooms at 769 Worthington Street and mailed a check to SHA.
    At 501 Worthington Street, SHA determined the tenant's annual income and calculated that tenant's monthly contribution, if any, towards the monthly rent.  SHA then reduced the monthly payments accordingly.  Therefore, FOH collected the tenant's

10

However, Keough waived rental obligations for certain tenants who either provided him with free services, such as labor at his personal or rental properties, or with whom he had a sexual relationship. Female Resident A and Female Resident B were two such individuals who did not have to pay rent because they shared a sexual relationship with him.

Count 27 / Female Resident A. Shortly after Female Resident A moved into FOH's 769 Worthington Street residence, Keough visited her room and solicited oral sex, which she provided because she felt obligated to do so. Thereafter, Keough solicited oral sex from her on a regular basis for the next several months, and then gave her a job at FOH.

By late January, 2001, Female Resident A was earning approximately $200.00 per week at FOH. Despite the fact that Keough knew that she now received income, Keough instructed FOH employees not to bill her for any rent. The FOH employees billed her anyway, but Keough told her to ignore the bills. Therefore, SHA never received any of her contributions towards rent for the months of January, 2002 and February, 2002.

In March, 2002, Keough moved Female Resident A to an efficiency apartment at 501 Worthington, ahead of the waiting list that existed for the newly opened unit. By this time, Keough and she were having

---

monthly rental contributions and kept the proceeds rather than sending them to SHA.

11

sexual intercourse on a regular basis. Once again, although she still had her job at FOH, she did not have to pay any rent for her unit at 501 Worthington.

Count 28 / Female Resident B.  Female Resident B began residing at 769 Worthington Street on April 30, 2002.  Keough told her that she would have to pay rent only if she received income.  Soon after residing at FOH, Guzman solicited oral sex from her, which she felt compelled to provide due to his position at FOH.  She performed oral sex on Guzman several times per week thereafter.  Around the same time, Keough took her back to his home at 1117-1119 Sumner Avenue and initiated a sexual relationship with her.

Also several weeks after residing at FOH, Female Resident B got a job at a nearby club, and began to receive cash income that ranged from several hundred dollars to a thousand dollars a night.[4]  Keough and told her not to report the club income.  After FOH employees learned about her job, one employee told Keough that she should be paying more rent.  Keough responded that unverified cash income did not qualify as income, and therefore, did not have to be reported.  Therefore, FOH never adjusted her rental contribution and never collected any additional rent from her.

---

[4] At the same time, Female Resident B began to receive SSI disability payments and was charged by FOH a monthly contribution of $191.00 per month.

2.  <u>Keough's Extortion Count (Count 29)</u>

In March 1998, a contractor named Frank Ware won a $432,000.00 contract to renovate a FOH shelter.  The contract was funded in large part by federal and state money.  As Executive Director, Keough actively participated in the selection of contractors and other aspects of the construction project, and was responsible for approving Ware's bills on the project.

In early 1999, Keough began constructing a vacation home in Charlestown, Rhode Island.  Keough told Ware that he had run into financing difficulties with his construction loan, and asked him if he could purchase lumber and materials through Ware's account at A. Boilard & Sons.  Keough promised Ware that he would repay Ware within ninety days.  Ware ultimately agreed because he felt that to refuse meant risking his business, since Keough exercised ultimate authority over Ware's project at FOH.  Keough opened an account at A. Boilard & Sons Lumber in the name of the Ware Group and began charging the construction materials for his Rhode Island residence to the account.  A. Boilard delivered the construction materials from its yard in Springfield, Massachusetts to Charlestown, Rhode Island.  The total amount billed to the account equaled $71,445.34.

Approximately two months after Keough opened the account at A. Boilard, A. Boilard began making demands for payment from Ware. Keough had not made any payments on the account.  Ware talked to Keough, who continued to tell Ware that he was having trouble with

his financing and assured Ware that he would pay him back. Because he felt that he had no choice, Ware began to make payments on the account. From April 23, 1999 to June 28, 1999, the Ware Group paid a total of $29,000 on Keough's account. Throughout this time frame, The Ware Group submitted periodic bills to FOH, which Keough approved, and received periodic payments based upon these bills.

In early December, 1999, Keough received approximately $130,000 in construction financing, and on December 8, 1999, Keough made a $42,445.34 payment to A. Boilard, thus paying off the remaining balance on the account  Ware did not receive any money from Keough after receipt of the construction financing. Ware asked Keough on a number of different occasions about re-paying the $29,000 during this time frame, but Keough continually put Ware off, telling Ware that he should not worry, and that he would take care of Ware. However, Keough never repaid Ware.

3. Keough's Obstruction of Justice
   (Counts 30, 33, 36, 38, 40, 42)

Count 30. Count 30 relates to a series of false statements that Keough made to FBI Special Agent Clifford Hedges between December 16, 2002 through April 29, 2003 about how he had paid for the construction of his residence in Charleston, Rhode Island, all in order to have his name removed from grand jury subpoenas being issued on behalf of the federal grand jury.

On December 16, 2002, Keough called Special Agent Hedges. During their conversation, Keough told Special Agent Hedges that he

had learned that Special Agent Hedges had been asking questions about SHA employees doing work on his Rhode Island house. Keough told Special Agent Hedges that he had served as the "general" [contractor] and that the heating "wasn't done by anybody with Housing Authority connections." These statements were false because Daniel McNamee, a SHA maintenance foreman, obtained the boiler, hot water tank, and baseboard heating units through SHA. McNamee served as the unofficial general contractor for the construction of Keough's Rhode Island residence and provided his services free of charge. As set forth above at pages 5-6, Keough rewarded McNamee with no-bid renovation work at FOH.

On April 8, 2003, Keough met with Special Agent Hedges and expressed concern that his name kept coming up in the context of the grand jury investigation. Keough falsely denied that any FOH money was ever used for his house, when in fact as set forth at pages 2-5, Keough had repeatedly used FOH employees on FOH time to work on his house and arranged for FOH to pay for certain expenses at the house.

On April 29, 2003, Keough spoke again with Special Agent Hedges and complained about grand jury subpoenas that included his name. Keough told Special Agent Hedges, in substance, that he paid for everything relating to the Rhode Island house, including the materials from A. Boilard (which had been paid for in part by Ware) and stated, "I would like to get my name off all these fucking subpoenas because you're hurting me businesswise."

After the grand jury had begun to issue grand jury subpoenas relating to Keough and learned that Keough had an account in the name of The Ware Group at A. Boilard & Sons, Keough asked to meet with Special Agent Hedges again. On April 29, 2003, Keough asked Special Agent Hedges to abandon the grand jury inquiry into his Rhode Island home based upon his false representations that he had done nothing wrong and that he personally had paid for every item that went into the Rhode Island home.

Count 33 / Witness A. Count 33 arises out of Keough's successful attempt to have an FOH employee (Witness A) lie for him before the federal grand jury. Keough hired Witness A to work at FOH full-time in January, 2000. From January 2000 through 2003, Keough regularly arranged for Witness A to work at Keough's Rhode Island home on FOH time, often with other FOH employees or inmates from the Hampden County House of Corrections. Witness A also transported to the Rhode Island house televisions and mattresses that Keough had purchased through FOH.

In April, 2004, Witness A received a subpoena to testify before the grand jury. Prior to his appearance, Keough asked Witness A to meet him at a local Friendly's. During the meeting, Keough told Witness A to say that he did all of the work at Rhode Island on personal time. Keough also told Witness A that he used bad judgment in permitting the inmates to do personal work for Keough, and that Keough had no knowledge of the inmates' work.

Witness A did what Keough asked him to do, and perjured himself during his March 16, 2004 and September 21, 2004 appearances. According to Witness A, he feared the loss of his job and health benefits if he did not do what Keough wanted him to do. After Keough's indictment, arrest and suspension from FOH in January, 2005, Witness A came to the U.S. Attorney's Office in May, 2005, admitted that he had perjured himself, and later corrected his testimony.

<u>Count 36 / Witness B</u>.  Count 36 arises out of Keough's unsuccessful attempt to have a former tenant, Witness B, lie for him before the federal grand jury. Witness B formerly lived in Keough's rental units at 24-26 Palmer Avenue and 53-55 Pomona Avenue from 2000 through 2003. Although Witness B was never homeless and was gainfully employed, Guzman had her falsely certified as homeless to subsidize her rent to Keough. Beginning in approximately May, 2001, Keough began receiving rental subsidy checks in the name of Witness B for her rental unit at 24-26 Palmer Avenue.

On June 14, 2005, Witness B met with Keough and showed Keough a grand jury subpoena that required her to appear on June 23, 2005. Keough then instructed Witness B to testify that she was homeless prior to enrolling in the rental assistance program, and whispered to her that she should not tell the grand jury that Keough had tenants (one of whom was also receiving ISSI assistance) living in the basement at 24-26 Palmer Avenue.

Count 38 / Witness C. Witness C rented 1119 Sumner Avenue from Keough between approximately 1999 and 2003. Per Keough's request, Witness C paid rent in cash. In approximately 2000, even though he knew that Witness C was not homeless, Keough arranged for Witness C to become falsely enrolled in the ISSI program. As a result, Keough received over $5,000 in ISSI payments for Witness C from July 1, 2000 through May 1, 2001. In approximately June 2005, Keough unexpectedly arrived at Witness C's workplace and stated, in substance, that he protects his friends, that everyone should get on the same page, and that if Witness C wanted to say that Witness C was homeless at the time that Witness C enrolled in the ISSI program, then he would back up Witness C.

Count 40 / Witness D. Witness D formerly worked at FOH. During her employment at FOH, in December 1998, Witness D once drove Keough to Frank Ware's office and remained in the car until Keough returned from his brief meeting. Witness D had no idea why Keough was meeting Frank Ware and saw nothing in Keough's hands. However, after the investigation began, Keough reminded Witness D on several occasions that the purpose of his meeting with Ware was to give him cash. On each occasion, Witness D has told Keough that Witness D had no idea what the purpose of the meeting was and never saw Keough give Ware anything.

As Keough knew, on Tuesday evenings, Witness D attended a regularly scheduled evening meeting at FOH and then drove to

Easthampton. On the evening of Tuesday, May 24, 2006 - two days before Witness D's scheduled grand jury appearance, Witness D attended a meeting at FOH. As Witness D drove away from FOH, Witness D recognized Keough's car following. Keough continued to follow Witness D onto the on ramp for Interstate 91 and headed north towards Easthampton. After Witness D pulled into the breakdown lane in an effort to avoid Keough, he followed Witness D into the breakdown lane, parked behind Witness D's car, and approached the car. Before he could say anything, Witness D told Keough that Witness D had nothing to say to him, and pulled away. This conduct has been charged as an attempt to "remind" Witness D that Witness D saw Keough hand cash to Frank Ware. See discussion of Count 35, below.

Count 42 / Witness E. Witness E worked as an intake worker at FOH. In approximately 2000, Keough, Hallahan, and Witness E hatched a scheme by which Witness E received pay for work not performed at FOH. In May, 2005, Keough called Witness E and told him to come to his home. When Witness E arrived, Keough told Witness E that he probably would be interviewed by investigators about no-show employees at FOH. Keough told Witness E to tell investigators that although he may not have worked some of the hours that appeared on his timesheets, he made up the hours on dates that were not recorded onto timesheets. Witness E told Keough that he did not want to get involved.

19

Sometime between July 29, 2005 and August 11, 2005, Keough's wife called Witness E, told Witness E that Keough was depressed, and asked Witness E to come by the residence and cheer up Keough. When Witness E arrived, Keough told Witness E that Hallahan had just been subpoenaed for the federal grand jury, and that the federal investigators were giving him a hard time about the FOH timesheets.[5] Keough produced a handwritten statement on which Keough had outlined the false story described above and gave it to Witness E to read. Witness E knew immediately that Keough wanted him to repeat the story about intake employees working hours on dates recorded onto timesheets. Witness E gave the handwritten statement back to Keough and told Keough that he did not want to get in any more trouble and would not do what Keough wanted. This conduct has been charged as an attempt.

4.  Keough's Witness Tampering
    (Counts 34, 35, 37, 39, 41, and 43)

Count 34 / Witness A. The facts underlying the obstruction in Count 33 (set forth at page 16) form the basis for this witness tampering count.

Count 35 / Witness A. In late 2004 or early 2005, Keough approached Witness A at FOH and asked him if he would say that he witnessed Keough give Frank Ware a large amount of cash, thus providing a defense to the extortion charge in Count 29. Witness A

---

[5] Special Agent Cliff Hedges served Hallahan with a grand jury subpoena on August 1, 2005.