UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR-N-04-30032-MAP |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| FRANCIS G. KEOUGH, III, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM FOR
## DEFENDANT FRANCIS G. KEOUGH, III

The United States of America, by and through Michael J. Sullivan, United States Attorney for the District of Massachusetts, and Steven H. Breslow, Assistant United States Attorney, hereby files the Government's Sentencing Memorandum For Defendant Francis G. Keough, III.

The government respectfully submits that the defendant warrants a sentence of 57 months incarceration, a fine of $100,000.00, and restitution in the amount of $145,000.00. The defendant's request for a downward departure or non-Guidelines sentence based on the factors set forth in 18 U.S.C. § 3553(a) should be rejected as baseless. See Defendant Frank Keough's Motion & Memorandum Of Law For Downward Departure (the "Motion") (Docket No. 180).

1

I.   The Defendant's Offense Conduct

   A.   Introduction

   As set forth in far greater detail in the Pre-Sentence Report dated March 1, 2007 and revised March 22, 2007 (the "PSR"), the defendant masterminded a vast and damaging series of crimes centered around his corrupt operation of Friends of the Homeless, Inc. ("FOH"), a vital institution serving Springfield's homeless population.  As FOH's Executive Director from 1994 to 2004, the defendant looted the FOH through a broad and systemic pattern of theft and fraud.

   In short, the defendant was no friend of Springfield's vulnerable homeless people -- to the contrary, in order to line his own pockets and live in a luxurious Rhode Island beach house, he shamelessly victimized both the homeless and the institution that he had pledged to serve.  The defendant's thievery was nearly boundless, as he even stole the very mattresses from his homeless shelter.

   Later, when the federal government began to investigate the defendant's offenses at FOH, he flouted the authority of both law enforcement and this Court by repeatedly obstructing justice, tampering with witnesses, lying to investigating agents, and committing perjury before the grand jury.  Indeed, the defendant went so far as to return the stolen mattresses to FOH from his Rhode Island beach house to avoid their discovery by searching agents.

In particular, the defendant pleaded guilty to the following charges in the Second Superseding Indictment (the "Indictment"):

1.  Count One, charging a violation of Title 18, United States Code, Sections 371, 1341, and 1346 (conspiracy to commit mail fraud);

2.  Counts Twelve, Fourteen, Seventeen, Nineteen, Twenty-Three, and Twenty-Four, each charging a violation of Title 18, United States Code, Sections 1341 and 1346 (mail fraud);

3.  Count Twenty-Nine, charging a violation of Title 18, United States Code, Section 1951 (extortion);

4.  Count Thirty, charging a violation of Title 18, United States Code, Section 1503 (obstruction of justice);

5.  Count Thirty-Two, charging a violation of Title 18, United States Code, Section 1001 (false statements);

6.  Count Thirty-Four, charging a violation of Title 18, United States Code, Section 1512 (witness tampering);

7.  Count Forty-four, charging a violation of Title 18, United States Code, Section 1623(a) (perjury); and

8.  Count Forty-Six, charging a violation of Title 26, United States Code, Section 7206(1) (filing a false income tax return).

B.    <u>Count 1</u>.

Count One charges the defendant, along with his co-defendants Angel Guzman and Michael Hallahan, with conspiracy to commit mail fraud.    The defendant had promoted Guzman and Hallahan to supervisory roles at FOH, with Guzman serving as his Operations Manager and Hallahan serving as his Intake Supervisor.    In particular, Hallahan was responsible for ensuring that all of FOH's intake workers' timesheets were true and accurate.    Indictment, ¶¶ 10-11.

Count One specifically charges the defendant, Guzman, and Hallahan with devising a scheme to defraud FOH, its governmental funding sources (collectively, the "governmental agencies"), and the public of money and the intangible right to the defendants' honest services, and then causing various invoices and checks to be mailed in furtherance of the scheme.    Indictment, ¶ 16.

The objects of the charged conspiracy include: to fraudulently obtain money, resources, and the intangible right to honest services from FOH and the governmental agencies; to conceal this fraud through the submission of false documents to FOH and the governmental agencies in order to obtain reimbursement for personal expenses; and to obstruct the federal grand jury investigation by concealing and attempting to conceal evidence and to tamper with witnesses.    Indictment, ¶¶ 17-19.

The methods and means of the conspiracy include the following: the defendant's appointment of conflicted FOH board members who exercised virtually no oversight over his operation of FOH; the defendant's procurement of goods and services for FOH from friends, family, and associates, all without any competitive bids; the defendant's and Guzman's recruitment of FOH residents and work release inmates to perform personal work for the defendant in exchange for certain benefits at FOH; and the submission by the defendant, Guzman, and Hallahan of fraudulent FOH timesheets which caused FOH to seek reimbursement from the governmental agencies for work that they did not do at FOH. Lastly, as reward for their involvement in the scheme to defraud, the defendant permitted Guzman and Hallahan to receive pay for hours not worked and referred them to an unindicted co-conspirator who processed fraudulent bank loans for them. Indictment, ¶¶ 20-24.

The Indictment details 73 different overt acts committed by the defendants in furtherance of this conspiracy. Indictment ¶¶ 25-98. These acts included acts of board-stacking (e.g., ¶¶ 25); diversion of goods, services, labor, or money from FOH and the governmental agencies to the defendant's residences in Springfield, MA and Charlestown, Rhode Island, Hallahan's Springfield, MA residence, or other purposes (e.g., ¶¶ 31, 32, 33, 35, 41, 43, 44, 47-53, 60, 61-63, 70-75, 76, 78, 81, 83-85, 86, 94); the falsification of timesheets to permit FOH employees to receive payment for time not

worked, which was often spent providing personal services to the defendant (e.g., ¶¶ 45, 46, 55, 57-59, 64, 82, 90, 93, 95); the corrupt manipulation of FOH's contracting process for the personal benefit of the defendant (e.g., ¶¶ 28-30, 33-34, 37-38, 40, 42); and the submission of false homeless program paperwork for the personal benefit of the defendant (e.g., 54, 65-69, 77, 79, 80); and the concealment of the conspiracy from the ensuing investigation (e.g., ¶¶ 87-89, 91, 92, 96, 97 and 98).

> C.   Mail Fraud Involving The Wages Of The Defendant,
>      Guzman, Hallahan, And Others (Counts 2 - 13)

Counts Two through Thirteen involve the mailings of reimbursement checks to FOH that in part paid for the salary of The defendant, Guzman, Hallahan, and others.  Like all FOH employees, the defendant, Guzman, and Hallahan had to fill out a weekly timesheet certifying that they had worked forty hours per week.  The timesheets eventually were attached to FOH's reimbursements requests that were sent to the City of Springfield or the Commonwealth of Massachusetts, which then mailed payment back to FOH.

By approximately 2001, the defendant generally spent only four hours of his day at FOH, even though he routinely submitted timesheets stating that he worked from 8:30 a.m. to 4:30 p.m. throughout 2002-2004.  In particular, during the 2003 campaign for Springfield's mayor, in which the defendant worked as a campaign manager for a candidate, he rarely showed up at work from the middle of August, 2003 through November, 2003, even though his timesheets

6

showed that he worked at least twenty hours per week throughout those months.

In addition, the defendant used FOH workers, including Guzman, to perform work on FOH time at his vacation home in Charlestown, Rhode Island. The defendant often drove the workers or permitted them to use his Jeep or the FOH van, and Hallahan signed their timesheets attesting to the accuracy of their hours. The defendant similarly arranged for FOH workers to perform maintenance work on his personal residence at 1117 Sumner Avenue in Springfield, MA and his two rental properties at 24-126 Palmer Avenue and 53-55 Pomona Street, also in Springfield, MA. This maintenance work consisted of routine maintenance, painting, landscaping, and other tasks. At least one worker estimated that from 2000 through 2003, he spent thirty percent of his FOH time working for the defendant personally.

D.   Mail Fraud Involving No-Bid Contracts (Counts 14 -16)

FOH submitted an annual grant application for HUD funds from the City of Springfield's Office of Community Development. Each year, FOH attested to the following fact in its application: "The agency does not maintain a purchase requisition system, but for any purchase over $500.00 the agency requires three bids and an approval by the Board of Directors." Either the defendant or a board member signed the attestation.

However, the defendant routinely ordered that FOH purchase certain goods or services exceeding $500.00 from friends or

relatives without obtaining the required three bids.  Such vendors included Mansfield Paper Co., whose president is the defendant's brother-in-law; Daniel McNamee, who acted as the defendant's informal general contractor for the Rhode Island house;[1] and Quinn Electrical Co., which was owned by a friend of the defendant's and which purchased electrical supplies for the defendant in order to obtain the contractor of 15-30% discount for him.

Each of the mailings in Counts Fourteen through Sixteen involved reimbursement checks from the City of Springfield that were funded by HUD, which checks paid in part for supplies purchased from Mansfield Paper Co. without the competitive bidding process.

E.   Mail Fraud Involving ISSI Diversion (Counts 17-22)

FOH offered its residents a program called the ISSI program. The ISSI program enabled homeless residents to apply for and receive rental assistance so that they could obtain apartments through private landlords.  FOH residents and program representatives had to certify that the residents were in fact homeless and income eligible.  If the residents satisfied the eligibility criteria, the residents would obtain an apartment and then receive approximately

---

[1]   On November 27, 2006, McNamee pleaded guilty to obstruction of justice (relating to his false testimony concerning his work at the defendant's Rhode Island home) and filing a false income tax return (relating to payments he received from the FOH).   On March 1, 2007, this Court sentenced McNamee, who cooperated with the government's investigation, to a term of two years of probation with a six month term of community confinement.

$500.00 per month in rental assistance for one year. HUD funded this program through HAP, the Hampden Housing Alliance Partnership.

The defendant, along with the assistance of Guzman and others, falsely certified that a number of individuals were homeless and income eligible through the ISSI program. Several of these individuals were already tenants of the defendant at the following premises: 1119 Sumner Avenue (Tenant A in Count 17); 24 Palmer Avenue (Tenant C in Count 19); 26 Palmer Avenue (Tenant E in Count 21); 24-26 Palmer Avenue (Tenant F) (Count 22)[2]. The defendant fraudulently received rental payments through the ISSI program or assisted individuals in obtaining rental assistance.[3] HAP mailed all of its rental checks to the defendant, thus establishing the use of the mails.

F.  Mail Fraud Involving Insurance Fraud (Count 23)

On or about December 26, 2000, the defendant reported to his insurance carrier, Union Mutual, that his boiler at 1117-1119 Sumner Avenue had cracked. Union Mutual arranged to have an appraiser inspect the boiler, and the appraiser verified the claim. Union

---

[2]  The defendant continued to receive ISSI checks even after he ostensibly sold Palmer Avenue to Guzman on March 18, 2002. See Count 24, discussed at page 10.

[3]  Tenant B in Count 18 rented an apartment that was not owned by the defendant. However, after arranging for Tenant B to receive ISSI assistance to which Tenant B was not entitled, the defendant later asked Tenant B to join FOH's Board of Directors in 2002.

Mutual subsequently agreed to cover the claim. The defendant instructed an FOH employee to replace the boiler. The FOH employee received $2,000.00 in cash from The defendant to purchase a boiler from a local plumbing supply company. The FOH employee then installed the boiler on FOH time. The defendant did not pay the FOH employee for his services.

Union Mutual subsequently asked the defendant for copies of the bills incurred to replace the boiler in order to process his claim. Finally, on May 8, 2001, Union Mutual received three bills: a bill for $3,300.00 from Thomas W. Smith General Contractor; $1,800.00 from Cote's Asbestos Removal; and $557.50 from Quinn Electrical. However, all of the bills were fraudulent. On May 17, 2001, Union Mutual mailed a check for $5,200.31, which subtracted the defendant's $250.00 deductible, to the defendant, who deposited the check into his personal account.

G.    Mail Fraud Involving Fraudulent Bank Loans
       (Counts 24-26)

Count 24. Count Twenty-Four charges the defendant and Guzman with mail fraud in connection with the defendant's sale to Guzman of 24-26 Palmer Avenue in March, 2002. Guzman obtained his loan for 24-26 Palmer Avenue from New Century Mortgage Corporation. According to the loan file, Guzman obtained a loan for $77,350.00 as a partial payment towards the $91,000.00 purchase price. Guzman completed a loan application in which he reported monthly income of $5,000.00 per month as an operations manager at FOH and $14,000.00

in savings at United Cooperative Bank.   However, Guzman earned approximately $2,000.00 per month at FOH and did not have a bank account at United Cooperative Bank.

Guzman's loan file contains a letter purportedly signed by Christine Packer of United Cooperative Bank verifying that Guzman had a balance of $14,000.  In fact, the defendant directed his FOH secretary to type a blank letter stating that Guzman had a balance of $14,000, which the defendant then copied onto United Cooperative Bank letterhead.   The defendant then directed a homeless FOH resident to forge the signature of Christine Packer onto the letter. The forged United Cooperative Bank letter actually bears the FOH facsimile number and name at the top of the letter.  The defendant earned a $14,350.00 net profit on the deal.

Count 25.  Count Twenty-Five charges the defendant and Guzman with mail fraud in connection with Guzman's sale of 24-26 Palmer Avenue in October, 2003.   Shortly after Guzman purchased the property, Guzman fell behind on his monthly payments.  The defendant took the property back and collected the rental payments from the tenants residing at Palmer Avenue, including tenants receiving ISSI assistance.   The defendant also had an FOH employee perform maintenance and other repairs on the property.   Ultimately, the defendant convinced his friend, Michael Tourville, the branch manager at Countrywide Home Loans, to buy the property from the defendant.

On October 3, 2003, Tourville purchased 24-26 Palmer Avenue, ostensibly from Guzman, after obtaining a $104,000.00 mortgage loan through Countrywide Home Loans.  According to the HUD Settlement Statement, Tourville owed Guzman $31,671.89 at the time of the closing, and Guzman should have received $44,994.64 from the sale of the property.  At the closing, Countrywide wired $104,000.00 into an attorney's IOLTA account, which in turn issued a $44,994.64 IOLTA check to Angel Guzman, who endorsed the entire amount over to Tourville.  Tourville deposited the $44,994.64 check into his personal account and approximately a month later, Tourville issued a cashier's check to the defendant for $13,000.00.

Thus, the defendant earned a profit twice on the same piece of property, using Guzman as the nominee on the second transaction. Nonetheless, the defendant did not report either capital gain on his income tax returns.

Count 26.  Count Twenty-Six charges the defendant and Hallahan with mail fraud in connection with the sale of 5 Desrosiers Street in July, 2004.  Hallahan's loan application contained several material falsities, including an overstatement of his bank account (which was historically overdrafted and contained a balance of 52 cents).  After the purchase, the defendant arranged for FOH employees to spread mulch, scrape, and paint at the property.

H.    Mail Fraud Involving Rent Waivers In Return For Sex
      (Counts 27, 28)

With the Springfield Housing Authority ("SHA"), FOH offered rooms and efficiency apartments at two shelters located at 769 Worthington Street and 501 Worthington Street.  Eligible tenants at these shelters had to pay only a portion of their rent, depending upon their annual income.[4]

However, the defendant waived rental obligations for certain tenants who either provided him with free services, such as labor at his personal or rental properties, or with whom he had a sexual relationship.  Female Resident A and Female Resident B were two such individuals who did not have to pay rent because they shared a sexual relationship with him.

Count 27 / Female Resident A.  Shortly after Female Resident A moved into FOH's 769 Worthington Street residence, The defendant visited her room and solicited oral sex, which she provided because she felt obligated to do so.  Thereafter, the defendant solicited

---

[4]  At 769 Worthington Street, SHA paid FOH a flat monthly rate for rooms.  FOH determined the prospective tenant's annual income and then calculated that tenant's monthly contribution, if any, towards his or her monthly rent for a room.  On a monthly basis, FOH collected the tenant's monthly rental contributions for rooms at 769 Worthington Street and mailed a check to SHA.

At 501 Worthington Street, SHA determined the tenant's annual income and calculated that tenant's monthly contribution, if any, towards the monthly rent.  SHA then reduced the monthly payments accordingly.  Therefore, FOH collected the tenant's monthly rental contributions and kept the proceeds rather than sending them to SHA.

oral sex from her on a regular basis for the next several months, and then gave her a job at FOH.

By late January, 2001, Female Resident A was earning approximately $200.00 per week at FOH. Despite the fact that the defendant knew that she now received income, the defendant instructed FOH employees not to bill her for any rent. The FOH employees billed her anyway, but the defendant told her to ignore the bills. Therefore, SHA never received any of her contributions towards rent for the months of January, 2002 and February, 2002.

In March, 2002, the defendant moved Female Resident A to an efficiency apartment at 501 Worthington, ahead of the waiting list that existed for the newly opened unit. By this time, the defendant and she were having sexual intercourse on a regular basis. Once again, although she still had her job at FOH, she did not have to pay any rent for her unit at 501 Worthington.

Count 28 / Female Resident B. Female Resident B began residing at 769 Worthington Street on April 30, 2002. The defendant told her that she would have to pay rent only if she received income. Soon after residing at FOH, Guzman solicited oral sex from her, which she felt compelled to provide due to his position at FOH. She performed oral sex on Guzman several times per week thereafter. Around the same time, the defendant took her back to his home at 1117-1119 Sumner Avenue and initiated a sexual relationship with her.

14

Also several weeks after residing at FOH, Female Resident B got a job at a nearby club, and began to receive cash income that ranged from several hundred dollars to a thousand dollars a night.[5]  The defendant and told her not to report the club income.  After FOH employees learned about her job, one employee told the defendant that she should be paying more rent.  The defendant responded that unverified cash income did not qualify as income, and therefore, did not have to be reported.  Therefore, FOH never adjusted her rental contribution and never collected any additional rent from her.

I.    The Defendant's Extortion (Count 29)

In March 1998, a contractor named Frank Ware won a $432,000.00 contract to renovate a FOH shelter.  The contract was funded in large part by federal and state money.  As Executive Director, the defendant actively participated in the selection of contractors and other aspects of the construction project, and was responsible for approving Ware's bills on the project.

In early 1999, the defendant began constructing a vacation home in Charlestown, Rhode Island.  The defendant told Ware that he had run into financing difficulties with his construction loan, and asked him if he could purchase lumber and materials through Ware's account at A. Boilard & Sons.  The defendant promised Ware that he would repay Ware within ninety days.  Ware ultimately agreed because

---

[5]  At the same time, Female Resident B began to receive SSI disability payments and was charged by FOH a monthly contribution of $191.00 per month.

he felt that to refuse meant risking his business, since the defendant exercised ultimate authority over Ware's project at FOH. The defendant opened an account at A. Boilard & Sons Lumber in the name of the Ware Group and began charging the construction materials for his Rhode Island residence to the account. A. Boilard delivered the construction materials from its yard in Springfield, Massachusetts to Charlestown, Rhode Island. The total amount billed to the account equaled $71,445.34.

Approximately two months after the defendant opened the account at A. Boilard, A. Boilard began making demands for payment from Ware. The defendant had not made any payments on the account. Ware talked to the defendant, who continued to tell Ware that he was having trouble with his financing and assured Ware that he would pay him back. Because he felt that he had no choice, Ware began to make payments on the account. From April 23, 1999 to June 28, 1999, the Ware Group paid a total of $29,000 on The defendant's account. Throughout this time frame, The Ware Group submitted periodic bills to FOH, which the defendant approved, and received periodic payments based upon these bills.

In early December, 1999, the defendant received approximately $130,000 in construction financing, and on December 8, 1999, The defendant made a $42,445.34 payment to A. Boilard, thus paying off the remaining balance on the account. However, Ware did not receive any money from the defendant after receipt of the construction

financing.   Ware asked the defendant on a number of different occasions about re-paying the $29,000 during this time frame, but the defendant continually put Ware off, telling Ware that he should not worry, and that he would take care of Ware.   However, the defendant never repaid Ware.

J.    The Defendant's Obstruction of Justice
      (Counts 30, 33, 36, 38, 40, 42)

Count 30.   Count 30 relates to a series of false statements that the defendant made to FBI Special Agent Clifford Hedges between December 16, 2002 through April 29, 2003 about how he had paid for the construction of his residence in Charleston, Rhode Island, all in order to have his name removed from grand jury subpoenas being issued on behalf of the federal grand jury.

On December 16, 2002, the defendant called Special Agent Hedges.  During their conversation, the defendant told Special Agent Hedges that he had learned that Special Agent Hedges had been asking questions about SHA employees doing work on his Rhode Island house. The defendant told Special Agent Hedges that he had served as the "general" [contractor] and that the heating "wasn't done by anybody with Housing Authority connections."  These statements were false because Daniel McNamee, a SHA maintenance foreman, obtained the boiler, hot water tank, and baseboard heating units through SHA. McNamee served as the unofficial general contractor for the construction of the defendant's Rhode Island residence and provided

his services free of charge.  As set forth above at page 7, the defendant rewarded McNamee with no-bid renovation work at FOH.

On April 8, 2003, the defendant met with Special Agent Hedges and expressed concern that his name kept coming up in the context of the grand jury investigation.  The defendant falsely denied that any FOH money was ever used for his house, when in fact the defendant had repeatedly used FOH employees on FOH time to work on his house and arranged for FOH to pay for certain expenses at the house.

On April 29, 2003, the defendant spoke again with Special Agent Hedges and complained about grand jury subpoenas that included his name.  The defendant told Special Agent Hedges, in substance, that he paid for everything relating to the Rhode Island house, including the materials from A. Boilard (which had been paid for in part by Ware) and stated, "I would like to get my name off all these fucking subpoenas because you're hurting me businesswise."

After the grand jury had begun to issue grand jury subpoenas relating to the defendant and learned that the defendant had an account in the name of The Ware Group at A. Boilard & Sons, the defendant asked to meet with Special Agent Hedges again.  On April 29, 2003, the defendant asked Special Agent Hedges to abandon the grand jury inquiry into his Rhode Island home based upon his false representations that he had done nothing wrong and that he personally had paid for every item that went into the Rhode Island home.

Count 33 / Witness A.  Count 33 arises out of the defendant's successful attempt to have an FOH employee (Witness A) lie for him before the federal grand jury.  The defendant hired Witness A to work at FOH full-time in January, 2000.  From January 2000 through 2003, the defendant regularly arranged for Witness A to work at his Rhode Island home on FOH time, often with other FOH employees or inmates from the Hampden County House of Corrections.  Witness A also transported to the Rhode Island house televisions and mattresses that the defendant had purchased through FOH.

In April, 2004, Witness A received a subpoena to testify before the grand jury.  Prior to his appearance, the defendant asked Witness A to meet him at a local Friendly's.  During the meeting, the defendant told Witness A to say that he did all of the work at Rhode Island on personal time.  The defendant also told Witness A that he used bad judgment in permitting the inmates to do the defendant's personal work, and that the defendant had no knowledge of the inmates' work.

Witness A did what the defendant asked him to do, and perjured himself during his March 16, 2004 and September 21, 2004 appearances.  According to Witness A, he feared the loss of his job and health benefits if he did not do what the defendant wanted him to do.  After the defendant's indictment, arrest and suspension from FOH in January, 2005, Witness A came to the U.S. Attorney's Office

in May, 2005, admitted that he had perjured himself, and later corrected his testimony.

Count 36 / Witness B.  Count 36 arises out of the defendant's unsuccessful attempt to have a former tenant, Witness B, lie for him before the federal grand jury.  Witness B formerly lived in the defendant's rental units at 24-26 Palmer Avenue and 53-55 Pomona Avenue from 2000 through 2003.  Although Witness B was never homeless and was gainfully employed, Guzman had her falsely certified as homeless to subsidize her rent to the defendant. Beginning in approximately May, 2001, the defendant began receiving rental subsidy checks in the name of Witness B for her rental unit at 24-26 Palmer Avenue.

On June 14, 2005, Witness B met with the defendant and showed the defendant a grand jury subpoena that required her to appear on June 23, 2005.  The defendant then instructed Witness B to testify that she was homeless prior to enrolling in the rental assistance program, and whispered to her that she should not tell the grand jury that the defendant had tenants (one of whom was also receiving ISSI assistance) living in the basement at 24-26 Palmer Avenue.

Count 38 / Witness C.  Witness C rented 1119 Sumner Avenue from the defendant between approximately 1999 and 2003.  Per the defendant's request, Witness C paid rent in cash.  In approximately 2000, even though he knew that Witness C was not homeless, the defendant arranged for Witness C to become falsely enrolled in the

ISSI program.  As a result, the defendant received over $5,000 in ISSI payments for Witness C from July 1, 2000 through May 1, 2001.

In approximately June 2005, the defendant unexpectedly arrived at Witness C's workplace and stated, in substance, that he protects his friends, that everyone should get on the same page, and that if Witness C wanted to say that Witness C was homeless at the time that Witness C enrolled in the ISSI program, then he would back up Witness C.

Count 40 / Witness D.     Witness D formerly worked at FOH. During her employment at FOH, in December 1998, Witness D once drove the defendant to Frank Ware's office and remained in the car until the defendant returned from his brief meeting.  Witness D had no idea why the defendant was meeting Frank Ware and saw nothing in the defendant's hands.  However, after the investigation began, The defendant reminded Witness D on several occasions that the purpose of his meeting was to give Ware cash.  On each occasion, Witness D has told the defendant that Witness D had no idea what the purpose of the meeting was and never saw the defendant give Ware anything.

As the defendant knew, on Tuesday evenings, Witness D attended a regularly scheduled evening meeting at FOH and then drove to Easthampton.  On the evening of Tuesday, May 24, 2006 - two days before Witness D's scheduled grand jury appearance, Witness D attended a meeting at FOH.  As Witness D drove away from FOH, Witness D recognized the defendant's car following.  The defendant

continued to follow Witness D onto the on ramp for Interstate 91 and headed north towards Easthampton. After Witness D pulled into the breakdown lane in an effort to avoid the defendant, he followed Witness D into the breakdown lane, parked behind Witness D's car, and approached the car. Before he could say anything, Witness D told the defendant that Witness D had nothing to say to him, and pulled away. This conduct was an attempt to "remind" Witness D that Witness D saw the defendant hand cash to Frank Ware. See page 28 (discussing a similar tampering in Count 35).

Count 42 / Witness E. Witness E worked as an intake worker at FOH. In approximately 2000, the defendant, Hallahan, and Witness E hatched a scheme by which Witness E received pay for work not performed at FOH. In May, 2005, the defendant called Witness E and told him to come to his home. When Witness E arrived, the defendant told Witness E that he probably would be interviewed by investigators about no-show employees at FOH. The defendant told Witness E to tell investigators that although he may not have worked some of the hours that appeared on his timesheets, he made up the hours on dates that were not recorded onto timesheets. Witness E told the defendant that he did not want to get involved.

Sometime between July 29, 2005 and August 11, 2005, The defendant's wife called Witness E, told Witness E that the defendant was depressed, and asked Witness E to come by the residence and cheer up the defendant. When Witness E arrived, the defendant told

Witness E that Hallahan had just been subpoenaed for the federal grand jury, and that the federal investigators were giving him a hard time about the FOH timesheets.[6]   The defendant produced a handwritten statement on which the defendant had outlined the false story described above and gave it to Witness E to read.   Witness E knew immediately that the defendant wanted him to repeat the story about intake employees working hours on dates recorded onto timesheets.   Witness E gave the handwritten statement back to the defendant and said that he did not want to get in any more trouble and would not do what the defendant wanted.   This conduct is charged as an attempt.

> K.   The Defendant's Witness Tampering
>      (Counts 34, 35, 37, 39, 41, and 43)

Count 34 / Witness A.   The facts underlying the obstruction in Count 33 (set forth at page 18) form the basis for this witness tampering count.

Count 35 / Witness A.   In late 2004 or early 2005, the defendant approached Witness A at FOH and asked him if he would say that he witnessed The defendant give Frank Ware a large amount of cash, thus providing a defense to the extortion charge in Count 29. Witness A refused, telling The defendant that he already had told the FBI that he did not know what Frank Ware looked like.   The defendant told Witness A that he would try to have other

---

[6] Special Agent Cliff Hedges served Hallahan with a grand jury subpoena on August 1, 2005.

individuals, including Witness D, say the same thing. <u>See</u> discussion of Count 40, set forth at page 21.

Count 37 / Witness B. The facts underlying the obstruction in Count 36 (set forth at page 19) form the basis for this witness tampering count.

Count 39 / Witness C. The facts underlying the obstruction in Count 38 (set forth at page 20) form the basis for this witness tampering count.

Count 41 / Witness D. The facts underlying the obstruction in Count 40 (set forth at page 21) form the basis for this witness tampering count.

Count 43 / Witness E. The facts underlying the obstruction in Count 42 (set forth at page 22) form the basis for this witness tampering count.

L.    The Defendant's False Statements (Counts 31 and 32)

The facts underlying the obstruction in Count 30 (set forth at pages 17-18) form the basis for these false statements counts.

M.    The Defendant's Perjury (Count 44)

As set forth above, the defendant knowingly arranged for Guzman, Witness A, and others to provide him on FOH time with work for his own personal benefit. In addition, the defendant deliberately and repeatedly failed to work his required forty hours per week at FOH. On March 9, 2004, the defendant appeared before the grand jury to produce FOH timesheets as a custodian of records.

He was notified that he was a target of the grand jury
investigation, received his warnings about his rights to counsel and
against self-incrimination, but agreed to answer certain questions.
In particular, the defendant falsely stated that FOH's timesheets
were accurate to the best of his knowledge.

N.    The Defendant's Criminal Contempt (Count 45)

On July 29, 2005, The defendant was arraigned on the instant
indictment. Magistrate Judge Kenneth P. Neiman found that the
defendant had violated his conditions of release based in part upon
several instances of obstruction and witness tampering charged in
the instant indictment,[7] but permitted him to remain on release and
directed him not to have any contact with any witnesses or potential
witnesses. On August 1, 2005, Judge Neiman memorialized that order
into writing.

Shortly after entry of that order, the defendant had his wife
call Witness A at FOH and asked him to come over to 1117 Sumner
Avenue to look at a faulty water heater. Upon arrival, the
defendant began asking Witness A whom he thought was cooperating
against him. Witness A left the house and immediately contacted the
FBI.

---

[7]    The government had also proffered evidence, not charged in
the instant indictment, that on April 20, 2005, the defendant
threatened Special Agent Clifford Hedges of the FBI as Hedges
attempted to serve The defendant's wife with a grand jury
subpoena.

On August 1, 2005, Special Agent Hedges served Michael Hallahan for an appearance on August 4, 2005. As set forth in the description of Count 42 at page 22, between July 29, 2005 and August 11, 2005, the defendant told Witness E that Hallahan had received a subpoena and then presented Witness E with a handwritten statement that outlined a false, exculpatory statement regarding the fraudulent FOH timesheets.

On August 11, 2005, Judge Neiman revoked the defendant's bail.

O.    The Defendant's False Income Tax Filings (Counts 46-50)

Counts 46-50 charge that the defendant willfully filed false federal income tax returns for the years 1999, 2000, 2001, 2002, and 2003 because he knew that the returns did not report all of his total income.

This income included approximately $29,000 in income that he derived from his extortion of Frank Ware (Count 29), his fraudulent theft of goods and services (Count One), his fraudulent receipt of his full wages and his theft of other FOH worker's wages (Counts 2-14), his fraudulent receipt of ISSI rental income (Counts 17-22); and capital gain from the fraudulent real estate transactions with Angel Guzman (Counts 24-25).

P.    The Impact On FOH

The PSR recognizes that:

> the residents of the programs that the defendant oversaw were cheated out of honest services. People who were in need of assistance were passed over for housing units,

26

> and rental subsidies, in lieu of the
> defendant's friends and acquaintances.
> Employees who should have been conducting
> housing search, drug counseling, and other
> assistance were either not at work, or were
> occupied doing Keough's personal tasks.

PSR ¶ 412.

As the current executive director of FOH, William Miller, made clear in the attached Victim Impact Statement dated March 27, 2007, (the "Impact Statement"), the defendant caused "serious neglect and harm" to FOH. Impact Statement, at 1. The defendant's conduct "damaged the reputation of the agency and the confidence of those with whom the agency interacts." <u>Id.</u>

Moreover, the defendant's failure to provide FOH with his honest services (and those of others under his employ) tangibly limited the agencies ability to provide its core services. For example:

- A meals program serving over 70,000 meals per year "had been badly neglected."

- The Food Bank of Western Massachusetts "severed its ties with FOH due to allegations that merchandise obtained from the Food Bank was being resold."

- A transitional living program was forced to operate in the basement at 769 Worthington Street, "despite the fact that raw sewage backed up regularly and flooded the basement."

- The rental subsidy arrangement with SHA "was in a shambles."

- Proper funding mechanisms and proper delivery of services had been neglected."

27

●"A post-detox program had been operating with little supervision on the premises."

●There were "limited or no attempts to implement any modern personnel policy" and "unconscionable" displays of favoritism."

Id. at 1-2.

Notably, "[o]ne of the worst things that Mr. Keough did was to accept an enormous salary for his position at such a small and ill-funded agency. He received a salary and benefits in excess of ten percent of the total operating budget . . . . It is just a further sign of Mr. Keough's disregard for the individuals in need of services and the needs of the agency, overall." Id. at 2.

Even now, several years after the defendant's departure from FOH, "[w]e are slowly trying to repair all of the neglect and harm caused by Mr. Keough. The lack of proper effort, and the deprivation of honest services by Mr. Keough and various staff members, has hindered the agency in its efforts to assist homeless individuals of the community and the region." Id. at 2.

II. The Defendant Merits A Sentence Of 57 Months

A.    The Defendant's Advisory Guidelines Range

The government conservatively estimated the loss caused by the defendant's conduct as $145,000.00. See PSR at ¶¶ 35 and 39. Although the PSR calculated a higher amount, the government maintains that this figure is an appropriate basis for determining

the defendant's advisory guidelines range, fine,[8] and restitution. The government respectfully submits that the defendant warrants the maximum sentence of the advisory guidelines range as calculated by the government: 46-57 months, based upon Offense Level 23 and Criminal History Category I.

The government respectfully submits that a non-guidelines sentence should be rejected. To the contrary, the factors set forth in 18 U.S.C. § 3553(a) all warrant no reduction from the government's guidelines range.

B.    The Nature And Circumstances Of The Offense

The nature and circumstances of the offense warrant a Guidelines sentence. As set forth above, the defendant not only committed, but orchestrated, an astonishing range of theft and fraud. As the PSR recognized:

> [T]he defendant was in a unique position of public trust. His job was to oversee the spending of funds intended to assist some of society's most vulnerable individuals: those with substance abuse issues and homeless individuals who suffer from a myriad of disorders, including Post Traumatic Stress Disorder and mental illnesses. Instead, the defendant not only turned the other cheek when employees submitted false time sheets, he did so himself. He instructed the bookkeeper to submit billings for reimbursement that she knew to be false, and used employees who were

---

[8]   Regardless of whether the Court adopts the loss amount estimated by the government or by the PSR, he defendant's fine range remains between $10,000.00 and $100,000.00, pursuant to U.S.S.G. § 5E1.2(c)(3).

> 'on the clock' to complete labor on his
> personal properties.

PSR ¶ 445.

When the defendant risked discovery of these offenses, he then chose the worst course possible: he repeatedly obstructed justice, tampered with witnesses, lied to investigating agents and the grand jury, and flouted pre-trial release conditions.  See PSR ¶ 413.

Given the seriousness of the underlying offenses and the defendant's central role, the nature and circumstances of the offense require a Guidelines sentence.  See 18 U.S.C. § 3553(a)(1).

C.   The Defendant's History And Characteristics
     Warrant A Guidelines Sentence

1.   The Defendant Merits A Guidelines Sentence

The personal characteristics of the defendant weigh in favor of the recommended 57-month Guidelines sentence.  First, unlike most defendants who come before this Court, the defendant had a "great childhood," earned a college degree, and held a series of important jobs, ultimately serving on the Springfield City Council from 1984 through 1992 and as its President from 1990 through 1992, before joining FOH as its Executive Director.  See PSR ¶¶ 481-483, 516.

Second, the defendant enjoys excellent physical health and mental health, and has no substance abuse problems.  PSR ¶¶ 502-05, 508-10.

Third, during the time that he committed his offenses, the defendant had not one, but three, residences - including a luxury

beach house on the Rhode Island shore.  Thus, the defendant had no clear financial need to commit his crimes.

Fourth, as the defendant's sentencing letters attest, he is embraced by a broad network of family and friends who remain supportive in spite of his legal woes.

Fifth, although the defendant did plead guilty to the numerous counts specified above, the PSR observed that even after his guilty plea he "was hesitant to accept full responsibility" for his offenses and "minimized his criminal conduct."  PSR ¶ 415.  For example, "he repeatedly justified his behavior by reiterating the fact that he likes to help people."  Id.  Thus, he attempted to explain away his illicit use of FOH labor at his Rhode Island beach house by claiming that the workers "went to the beach, went canoeing, and ate food that the defendant provided" and by insisting that he was rewarding them for their hard work.  PSR ¶¶ 418, 501. He also justified his subversion of FOH's bidding process by claiming that he knew contractors who could do FOH's work quickly. PSR ¶ 416.

Similarly, the defendant has consistently frustrated the efforts of the United States Attorney's Office and the Probation Department to ascertain the defendant's true financial worth.  PSR ¶ 517.  Within thirty days of his guilty plea, the defendant was required to deliver to the United States Attorney's Office:

> a sworn financial statement, executed under
> the pains and penalties of perjury, fully and

> truthfully disclosing the existence, nature
> and location of all assets in which Defendant
> currently has any legal or beneficial
> interest, and all assets over which Defendant
> has exercised control, or has had any legal or
> beneficial interest, at any time from April
> 23, 1999 to the present.

PSR at 43.  On March 26, 2007, counsel for the defendant finally submitted a sworn financial statement executed by the defendant on March 16, 2007, but the statement included absolutely no supporting documentation, even though the statement specified that "[a]ll entries must be accompanied by supporting documentation." Thus, the government and the Court are left unable to verify the defendant's net worth, even as the defendant claims to be unable to satisfy his required $145,000 forfeiture.[9]  PSR at 43.  An accompanying financial statement that appears to have executed by the defendant's wife was not sworn to under penalties of perjury.

2. The Defendant's Family Circumstances Are Not
   Extraordinary And Do Not Warrant A Non-Guidelines
   Sentence

The defendant seeks to mitigate his own punishment by claiming extraordinary circumstances.  The government concedes that the defendant's family circumstances are indeed unfortunate,[10] but

---

[9]  On March 21, 2007, the defendant tendered a check in the amount of $88,105.44, but claims to be unable to make any additional payment.

[10]  In particular, the government credits the letters of Drs. Shannon Kay and Mark E. Belemjian.

respectfully submits that they do not warrant a sentence below the 57 months recommended by the government.

Section 5H1.6 of the Sentencing Guidelines states that "[f]amily ties and responsibilities and community ties are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S.S.G. § 5H1.6. The First Circuit only rarely affirms departures for exceptional family circumstances, such as when a defendant was so irreplaceable that incarceration would cause exceptional hardship to his family. United States v. Rosselli, 366 F.3d 58, 68 (1st Cir. 2004). In order to determine whether this limited circumstance exists, the district court must inquire as to whether there are "feasible alternatives of care that are relatively comparable to what the defendant provides." United States v. Pereira, 272 F.3d 76, 82 (1st Cir. 2001). As the First Circuit has recognized, "[a] defendant's incarceration will invariably cause hardship to his family," United States v. Louis, 300 F.3d 78, 82 (1st Cir. 2002), and "immense hardships" fall within the heartland of family circumstances that do not warrant departure. Pereira, 272 F.3d at 81 (collecting cases).

The First Circuit has disapproved departures in cases with family circumstances similar to or worse than this defendant's. See United States v. Claudio, 44 F.3d 10, 16 (1st Cir. 1995) (affirming district court's denial of departure based upon defendant's need to care for 12-year old son suffering from neurological condition and

learning disorder); <u>United States v. Chestna</u>, 962 F.2d 103, 107 (1st Cir. 1992) (holding departure was not warranted for defendant who was the single mother of four young children); <u>United States v. Rushby</u>, 936 F.2d 41, 42-43 (1st Cir. 1991) (holding that defendant's steady employment for ten years, status as main breadwinner for wife and two children, and aid to wife's grandmother "are simply not sufficient to invoke the exceptions implied by the word 'ordinary' in §5H1.6"); <u>United States v. Carr</u>, 932 F.2d 67, 72-73 (1st Cir. 1991) (reversing departure where defendant and her husband both faced prison terms because defendant's mother could take care of their young child).

Consistent with these decisions from the First Circuit, this Court recently refused to grant a departure based upon far more deserving family circumstances. <u>United States v. Naomi Watford</u>, 05-30057-MAP (January 16, 2006). In <u>Watford</u>, the defendant was the primary caregiver for four young children (aged between 1 and 11) who were present during an armed home invasion, in which she was severely beaten. The defendant had proffered a detailed expert psychological evaluation which concluded that the defendant's imprisonment would have a "pronounced and deleterious effect" on the children, whose father had been recently incarcerated. Nonetheless, this Court held that the defendant's circumstances did not suffice to warrant a departure and sentenced her to three years in prison –

what the defendant is approximately facing if he is continued to be incarcerated for the recommended 57-month term.

Here, the government respectfully submits that the defendant's request for a departure or non-Guidelines sentence should be denied for the following reasons.

First, the defendant's claim is technically waived since the defendant's supporting documents were submitted only ten days before sentencing and the defendant's memorandum of law was submitted only one day before sentencing, instead of the twenty-one days required by the Plea Agreement.  PSR at 39.

Second, the defendant's family circumstances do not outweigh his other Section 3553 considerations, including the other aggravating factors of his personal characteristics but particularly the nature of his offense and the need for a just sentence.

Third, rather than sacrifice any assets, the defendant voluntarily consented to his pre-trial detention (and thus his separation from his family) since August 11, 2005, rather than risk the forfeiture of a $200,000.00 bond.  See Docket No. 164, at 2. Since the defendant's family has managed his absence for nearly eighteen months, it should continue to do so for the duration of his incarceration.

Fourth, as the defendant's letters make clear, the defendant's family is clearly embraced by a broad network of relatives and friends who remain supportive and able to provide care.

Fifth, the defendant's family circumstance appears to have arisen in approximately early 2003, after which the defendant engaged in many new offenses – including the contemptuous witness tampering that resulted in the defendant's pre-trial detention. Thus, the suffering posed to the defendant's family from his continued incarceration is in large part a circumstance of his own making.

Finally, the government's recommendation of 57 months is the bottom end of the advisory guidelines sentencing range recommended by the PSR, and 14 months below the top end of that range.

In sum, the defendant's family circumstance, while unfortunate, is "simply not sufficient to invoke the exceptions implied by the word 'ordinary' in §5H1.6." Rushby, 936 F.2d at 42-43. Because the defendant is not irreplacable during the period of his incarceration, his request for a family circumstances departure should be denied.

### 3. The Defendant's Work At FOH Does Not Merit Any Sentence Reduction

Second, the defendant's professional accomplishments at FOH have no bearing on the defendant's sentence. As an initial matter, the record hardly indicates that the defendant served FOH with distinction. To the contrary, the FOH Impact Statement makes clear that FOH suffered dearly from the defendant's poor stewardship.

Moreover, the defendant should hardly receive a sentencing benefit for doing his job, particularly since he so corrupted the

institution he led.  As one court has reasoned, such accomplishments:

> should be given a lesser weight in the context of a top elected municipal official who criminally and shamelessly flouts his lawful authority and the public trust. [The defendant] was convicted of corrupting the very public office he used for the good works for which he now claims credit. While he may take credit for at least a portion of Bridgeport's economic turnaround while he was its chief executive, even more money and opportunity potentially would have been available for the public's benefit had the defendant not been getting kickbacks from city contracts and had he not awarded the contracts to and through his co-conspirators rather than permitting a genuine competitive bidding process. [The defendant] used his power as mayor both for city improvements and for racketeering, extortion, and fraud, and positive results do not counterbalance his crimes.

United States v. Gamin, Crim. No. 01-263, 2006 W.L. 1210984 *3 (D. Conn. May 5, 2006).

> 4.    The Defendant's Other Good Works
>       Do Not Merit Any Sentence Reduction

Similarly, the defendant's non-FOH related good works described in the defendant's letters do not warrant a sentence reduction. The defendant's good works are ordinarily not relevant to determining whether the defendant should receive a departure from the applicable Guidelines range. See U.S.S.G. § 5H1.11.

Courts generally recognize that the charitable and civic deeds of affluent or professionally successful individuals, such as the defendant in this case, do not normally render their good works

37

sufficiently unusual or exceptional to warrant a downward departure. See, e.g., United States v. Thurston, 358 F.3d 51, 80-81 (1st Cir. 2004); United States v. Crouse, 145 F.3d 786, 788 (6th Cir. 1998); United States v. Kolhbach, 38 F.3d 832, 839 (6th Cir. 1994); United States v. Haversat, 22 F.3d 790, 796 (8th Cir. 1994).

As the First Circuit explained:

> It is hardly surprising that a corporate executive like Thurston is better situated to make large financial contributions than someone for whom the expenses of day-to-day life are more pressing; indeed, business leaders are often expected, by virtue of their positions, to engage in civic and charitable activities. Those who donate large sums because they can should not gain an advantage over those who do not make such donations because they cannot.

Thurston, 358 F.3d at 80.

Here, the defendant, who is responsible for hundreds of thousands of dollars of theft or fraud, had placed himself in a position to be unusually generous, with either his time or his money. For example, the defendant could well afford to donate his time or money to a charity or a neighbor when he did not have to spend any time working at his own home improvement projects, much less paying for other goods and services.

Indeed, the defendant's involvement in civic organizations may actually be more self-serving than selfless, to the extent that it cast him in a positive, law-abiding light. "At the very minimum, therefore, goodwill accrued to the defendant from his community

activities." <u>United States v. Scheiner</u>, 873 F. Supp. 927, 934, n.7 (E.D. Pa. 1995).

The defendant's prior service, even taken in its most favorable light, simply does not warrant any adjustment from the advisory Guidelines range, particularly in view of his professional success and considerable assets, as well as the nature of his offense. <u>See</u> <u>Thurston</u>, 358 F.3d at 79-81 (reversing downward departure); <u>United</u> <u>States v. Barbera</u>, Cr. No. 02-1268, 2004 WL 2403868 at *12 (S.D.N.Y. Oct. 27, 2004) (rejecting request for downward departure despite defendant's extensive fundraising and service on boards of various community and civic organizations); <u>Scheiner</u>, 873 F. Supp. at 934 (rejecting request for downward departure despite defendant's sponsorship of basketball teams, service at a free medical clinic, and community board activity).

     5.  <u>Conclusion</u>

The totality of the defendant's history and personal characteristics warrant the requested 57-month Guidelines sentence. <u>See</u> 18 U.S.C. § 3553(a)(1).

     D.  <u>The Need for the Sentence Imposed</u>

A Guidelines sentence is required "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

Here, the defendant participated in offenses that gravely harmed the FOH and its needy clients, its honest employees, and its funding sources, and then demonstrated blatant disrespect for the law by repeatedly obstructing the investigation into these crimes.

In this case, where the defendant participated in a series of crimes marked by naked greed and brazen disrespect for the law, only a Guidelines sentence will promote "respect for the law" and "provide just punishment." 18 U.S.C. § 3553(a)(2)(A). Moreover, a Guidelines sentence would provide general deterrence for others similarly situated in society. See 18 U.S.C. § 3553(a)(2)(B).

III. <u>Restitution</u>

The government respectfully submits that the defendant pay restitution in the amount of $145,000.00, allocated as follows:

1. <u>SHA - $1,720.00</u>. The defendant and Daniel McNamee fraudulently billed SHA a total of $1,720.00 for a boiler, hot water heater, and baseboard convection heating units that the defendant installed at his Rhode Island beach house. PSR ¶¶ 262-66.

2. <u>Union Mutual Insurance Co. - $5,200.31</u>: Union Mutual paid the defendant $5,200.31 in fraudulent insurance claims for expenses that the defendant did not incur. PSR ¶¶ 295-99.

3. <u>FOH - $138,079.69</u>.

As the most direct victim of the defendant's crimes, FOH merits the balance of the defendant's restitution. First, the defendant fraudulently billed FOH for electrical supplies ($2,664.00) and a hydronic heater ($287.14) that he installed at his Rhode Island beach house. PSR ¶¶ 260-61. The defendant also misappropriated from FOH miscellaneous other items, including mattresses, refrigerators, televisions, and chainsaws, for an unknown total value, that the defendant used at his Rhode Island beach house. PSR ¶¶ 267-70.

Most importantly, however, the defendant harmed FOH by denying the shelter (and its residents and honest workers) the honest services of himself and others which he appropriated for his own personal gain. Even if monies for this stolen payroll largely originated with the funding agencies,[11] FOH still lost honest services in an amount equivalent to the misspent salaries. For example, "[e]mployees who should have been conducting housing search, drug counseling, and other assistance were either not at work, or were occupied doing Keough's personal tasks." PSR ¶ 412. As a result, FOH (and not its funding sources) should be the primary recipient of the remaining restitution.

---

[11] According to FOH, a significant share of the defendant's salary (ranging from 15-56% per year, from 2000 to 2005) originated with FOH, which obtained it from other non-profit sources, such as the United Way.

IV.   Fine

The government respectfully requests that the Court impose a fine of $100,000.00, constituting the maximum of the defendant's guideline range.  As set forth above at pages 31-32, the defendant has not established that he is unable to pay a fine.  Further, the government notes that according to the defendant's (unsubstantiated) financial statement, "my house in Charlestown, RI has no access currently.  If it did, it could be worth $500,000 - $800,000." Financial Statement, at 6.

Such a fine signals to this defendant, the general public, and others tempted to engage in corrupt behavior, that crime does not pay.

V.   Conclusion

For the foregoing reasons, the Government respectfully asks that the Court impose a sentence of 57 months incarceration, a fine of $100,000.00, and restitution in the amount of $145,000.00.

Filed this 28th day of March, 2007.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney


    /s/ Steven H. Breslow
STEVEN H. BRESLOW
Assistant United States Attorney

42

CERTIFICATE OF SERVICE

Hampden,  ss.                        Springfield, Massachusetts
                                     March 28, 2007


     I, Steven  H.  Breslow,  Assistant  U.S.  Attorney,  do  hereby
certify that I have served a copy of the foregoing by electronically
filing said motion to:


Daniel Kelly, Esq.
101 State Street, Suite 715
Springfield, MA  01103
Counsel for defendant Francis G. Keough, III


                         /s/ Steven H. Breslow
                        STEVEN H. BRESLOW
                        Assistant United States Attorney